CHRISTIAN A. ZABRISKIE, APPELLANT, *v.* THE CLEVELAND, CO-
LUMBUS, AND CINCINNATI RAILROAD COMPANY, AND JOHN A.
BUTLER, AND OTHERS.

In 1851, the Legislature of Ohio passed a general law relating to railway com-
panies, which empowered them at any time, by means of their subscription to
the capital stock of any other company or otherwise, to aid such other railroad
company, provided no such aid shall be furnished until, at a called meeting
of the stockholders, two-thirds of the stock represented shall have assented
thereto.

In 1852, another act was passed for the creation and regulation of incorporated
companies in Ohio, re-enacting the above section, and providing further, that
any existing company might accept any of its provisions, and when so ac-
cepted, and a certified copy of their acceptance filed with the Secretary of
State, that portion of their charters inconsistent with the provisions of this act
shall be repealed.

The Cleveland, Columbus, and Cincinnati Railroad Company, when they en
dorsed the bonds hereafter mentioned, had not formally complied with eithe:
of these requirements; had neither convoked a meeting of the stockholders,
nor signified their acceptance to the Secretary of State.

In April, 1854, the Cleveland, Columbus, and Cincinnati Railroad Company
endorsed a guaranty upon four hundred bonds of one thousand dollars each,
with interest coupons at seven per cent. interest, issued by the Columbus,
Piqua, and Indiana Railroad Company.

A stockholder in the Cleveland, &c., Company filed a bill to enjoin the directors
from paying the interest upon the bonds which they had thus guarantied,
upon the ground that these directors had exceeded their legal authority in
making the guaranty. Some of the bondholders came in as defendants with
the corporation.

As between the parties to this suit, the acceptance of the acts of 1851 and 1852
may be inferred from the conduct of the corporators themselves. The cor-
poration have executed the powers and claimed the privileges conferred by
them, and they cannot exonerate themselves from the responsibility by assert-
ing that they have not filed the evidence required by the statute to evince
their decision.

Amongst the acts of the corporators was this—that at a meeting of the stock-
holders of the Cleveland Company, in July, 1854, the endorsement of the bonds
was approved, adopted, and sanctioned, and this resolution has never been
rescinded at any subsequent annual meetings, of which there have been sev-
eral, at which the complainant was represented. His proxy was also present
at the meeting of July, 1854, but declined to vote, when his vote would have
controlled the action of the meeting.

These negotiable securities have been placed on sale in the community, accom-
panied by these resolutions and votes, inviting public confidence; and a cor

poration cannot, by their representations or silence, involve others in onerous engagements, and then defeat the calculations and claims their own conduct has superinduced.

THIS was an appeal from the Circuit Court of the United States for the northern district of Ohio.

Zabriskie was a citizen of the State of New York, and a stockholder in the Cleveland, Columbus, and Cincinnati Railroad Company. He filed a bill against the company, and obtained an injunction to restrain them from paying any money in discharge of the interest to become due on four hundred bonds of the Columbus, Piqua, and Indiana Railroad Company, which said bonds had been endorsed by the former company conjointly with the Bellefontaine and Indiana Railroad Company, and the Indianapolis, Cleveland, and Pittsburgh Railroad Company. Butler, Belknap, and Callender, citizens of Connecticut, obtained leave to become parties to the suit, as defendants, upon the allegation that each of them was the holder of a bond or bonds which had been thus endorsed.

After much testimony was taken, and other proceedings had, the Circuit Court, in March, 1858, dissolved the injunction and dismissed the bill. The complainant appealed to this court.

It was argued by *Mr. Otis* and *Mr. Benjamin* for the complainant, and by *Mr. Stanberry* and *Mr. Ewing* for the defendants, *Mr. Ewing* being the solicitor for the bondholders.

The history of the case is given in the opinion of the court, and it will be perceived, by the syllabus prefixed to this report, how many points were raised in the argument and decided by the court. The examination of the laws of Ohio was very extensive; too much so to be followed by the reporter. All that he can do is to state the points made, from which the line of argument can be easily deduced.

*Mr. Otis* said:

The record presents the following questions for the decision of the court:

I. Had the directors of the Cleveland, Columbus, and Cincinnati Railroad Company the power to endorse the bonds of the Columbus, Piqua, and Indiana Railroad Company?

II. Were said bonds and the endorsement thereon void in the hands of Neil & Dennison, and of those claiming under them?

III. Are the defendants, Butler, Belknap, and Callender, bona fide holders of said endorsements, without any notice, actual or constructive, of the circumstances under which the endorsements were made, or of the want of power on the part of the directors of the Cleveland, Columbus, and Cincinnati Railroad Company to make the same?

IV. Has the complainant forfeited his right to the relief which he seeks by any neglect on his part?

Upon the first point, the following positions were maintained:

The company had no power to endorse under their charter.

They had no power to endorse under the act of March 30, 1851:

First. Because said act had been repealed.

Second. Because the General Assembly intended to repeal said act.

Third. Because the endorsement was not made for any of the objects authorized by said act.

Fourth. Because the endorsement was not made with reference to said act of March 3d, 1851, as the source of power, but with reference to the charter.

Fifth. Because, in making said endorsement, there was no compliance with the imperative prerequisite conditions of said act.

Sixth. Because neither the complainant nor any considerable number of the stockholders of said company ever consented to said endorsement, either directly or by implication.

Seventh. Because said act of March 3d, 1851, is unconstitutional.

Upon the last point, the following brief extract from the argument of *Mr. Otis* will serve to illustrate his views:

A brief inquiry into the nature and extent of the authority

which the Legislature may lawfully exercise over railroad companies, and also into the nature and extent of the changes which the Legislature may make in the charters of such companies, with the consent of the organized bodies respectively, without any well-founded legal objection on the part of any individual stockholder, will throw much light upon the particular subject now under consideration, and tend to confirm the conclusion that the act of March 3d, 1851, was an unconstitutional enactment.

The first branch of this inquiry is not altogether free from difficulty. But this difficulty does not so much consist in laying down a general rule, as in applying the rule to each particular case which may arise. It is sufficient, however, for the present purpose, to say that grants to railroad companies are strictly construed, and that the corporations take no rights from the public beyond what the natural import of the words used in their acts of incorporation rationally and properly conveys. These grants are never construed to embrace public rights and duties; nor can it be presumed that the Legislature intended to part with the power of accomplishing the very object for which railroad companies are created. This object is the comfort and convenience of the public; and whatever regulations will tend to secure or promote that object the Legislature may enact, even though these regulations may abridge the value of the rights previously granted. It is upon this ground that railroad companies may be lawfully required to fence their roads, construct cattle guards, diminish the speed of their trains, and generally submit to such police regulations in respect to the management of their respective roads as will most effectually secure the safety of the persons and property transported over the same; and so long as the Legislature shall confine its action to the due exercise of the rights granted, no question can arise as to the lawfulness of such legislation.

The second branch of the inquiry depends upon a very different principle; and although I cannot describe by general definition all the particular changes which may be made in the charters of railroad companies, with the consent of such

companies, without any well-founded legal objection on the part of any individual stockholder, a recurrence to the nature of these charters will enable us to attain all that certainty in this particular which the argument demands. A railroad charter once accepted becomes a contract; and though the charter is an entirety, it is in fact a two-fold instrument both in regard to its subject matter and the parties thereto. So far as the charter relates to the object of the grant, the mode of carrying the same into execution, or the organs through which the company may act, it constitutes a contract between the State and the organized body; and it is competent for the company, acting in the manner prescribed in its charter, to accept of any amendments touching these subjects which the Legislature may propose, even though these amendments are evidently less beneficial to the company than the original act. To this contract the individual stockholder is not a party except as a member of the organized body. And as it is a fundamental principle of all associations of this kind, that the act of the majority is the act of all, the organized body will be bound by the action of the majority, however vehemently a minority of individual stockholders may dissent therefrom. It is upon the ground that the contract is one between the State and the corporation as the sole parties thereto, and not upon any implied assent, on the part of individual stockholders on becoming members of the corporation, to such changes as shall be auxiliary to the object of the grant, that all the stockholders are bound by such legislation. But so far as the charter relates to the obligation of the company to expend all its subscriptions solely for the specified purposes of the grant, or, in other words, in the construction and equipment of its road, or to the right of each individual stockholder to his ratable share of the net earnings of the company in the shape of dividends, or to his right to vote upon each share of stock owned by him in the election of a board of directors, it is a contract between each individual stockholder and the organized body, made in pursuance of the authority conferred by the State. To this contract the State is not a party; but the individual stockholder on the one hand, and all the other stockholders forming

the organized body on the other, are the sole parties to the contract. And although the nature of this contract is such that it cannot be changed, even by the consent of the parties to it, without legislative permission, such permission does not confer upon either party the authority to make such change without the consent of the other party. This contract between the individual stockholder and the corporation is essentially like a contract of copartnership, and can no more be changed than any other private contract without the consent of the parties thereto.

Natusch *v.* Irving et al., Gow. on Part., Appendix, 576.

Livingston *v.* Lynch, 4 Johns. Chy., 573.

Angell and Ames on Cor., secs. 536, 537, 538.

The fact that no individual stockholder can maintain a suit in regard to his individual rights or interests until after the company, upon request made, shall have neglected or refused to protect the same, does not militate against this view of the duality of all such contracts, for the corporation is the legally constituted trustee of every individual stockholder, through which alone he must in the first instance seek redress. There are no difficulties connected with this question in its relation to this case except those which have arisen from the illogical mode of treating it. If the act of March 3d, 1851, was intended to confer upon a majority of the stockholders of the Cleveland, Columbus, and Cincinnati Railroad Company authority to take the money due to the stockholders as dividends, and to appropriate it to any of the purposes mentioned in the fourth section of said act, against the consent of a single stockholder, though owning but a single share of stock, the enactment transcended the constitutional power of the Legislature, and was void. The Legislature cannot authorize any number of the stockholders of a railroad company, under any pretext whatever, to seize the money due to a co-stockholder as dividends, and appropriate it to any purpose not specified in its charter, or to confiscate his property, or compel him to sell out his capital stock at any price, and abandon the company, unless such power is reserved in the act of incorporation. The obligation of the contract, which relates to a single share of

the capital stock of a railroad company, can no more be impaired by legislative interference, than the obligation of the contract which relates to the entire capital stock   The protecting power of the Constitution extends to both alike.

As before stated, a railroad charter once accepted becomes a contract. Until such charter shall be accepted, it is not a contract; it is nothing more than a proposition, on the part of the State, to the corporators named in the act, to enter into the contract specified therein. It has no binding force until accepted; and in this respect a charter does not differ at all from a proposition to enter into a private contract proceeding from one individual to another. So where a charter has been accepted, a subsequent amendment is also nothing more than a proposition to change the original contract in that particular. If the proposed change relates to the contract between the State and the organized body, it must be accepted by the organized body before it will have any binding force; but if the proposed change relates to the contract between the individual stockholder and the organized body, it must be accepted by both the parties thereto before it will have any binding force. If the proposed change be clearly beneficial either to the individual stockholder or to the company, as the case may be, and be auxiliary to the specified purposes for which the company was created, the law will presume the acceptance of such amendment by the party to be benefited thereby upon very slight grounds. But, if the proposed change be not clearly beneficial to the individual stockholder, or to the company, or if it extends the objects or increases the liabilities of the company, or enlarges the powers of the company over the stockholders, as in the present case, the acceptance of such amendment, by the party to be affected thereby, must be clearly made out by the party seeking to establish the same. In cases of railroad companies, where a majority of the stockholders are residents without the State and country, as in this case, and are not expected to attend the meetings of the company, and who have a right to suppose that the directors will confine themselves to the exercise of their legitimate powers, silence on the part of the stockholders

should not be regarded as an assent to, or an acquiescence in, any changes in the contract between the corporation and the stockholders affecting their individual interest; but it should be established by clear affirmative proof that knowledge of such change, and of its effects upon their interest, was brought to the stockholders, and with such knowledge they deliber ately assented thereto. Any rule short of this will expose to imminent hazard the property invested in the railroads in this State, and seriously impair the character of our legislation.

The argument upon the other points must be omitted for want of room. All these points were sustained by *Mr. Benjamin* also.

*Mr. Ewing*, for the bondholders, made the following points, namely:

1. The guaranty is valid in the hands of the present hold ers, independently of the act of March 4th, 1851.

2. The end and aim, the object and purposes, to be effected by this contract, were legitimately within the power of the corporation, under and by virtue of the act of March 3d, 1851.

3. The fourth section of the act of 1851, and its re-enact ment in 1852, so far as it applies to pre-existing corporations, does not impair the validity of the contract of subscription, and is not unconstitutional and void.

4. The transaction out of which the guaranty arises comes within the provisions of the fourth section of the act of March 4th, 1851.

5. The transaction is not void, as contended for by the opposite counsel, under the fourth section of the act of March 3d, 1851, because the directors of the company acted in the matter before they convened the stockholders to vote upon it.

6. The contract has been complied with by the other two companies, and performance is, in equity, equivalent to consent.

Upon the third point, *Mr. Ewing's* views were as follows:

But it is contended, on the other side, that the fourth section of the act of 1851, and its re-enactment in 1852, so far as it applies to pre-existing corporations, impairs the validity

of the contract of subscription, and is therefore, as to them, unconstitutional and void.

I do not readily perceive how a law, permissive merely, not compulsory, authorizing this corporation to do an act which we admit, *argumenti gratia*, it was not authorized to do before, violates the contract of incorporation, or the contract between corporation and corporators. It has been well adjudged that the mere extension of privileges by law is not a violation of the contract of incorporation.

> Grey *v.* the Monongahela Navigation Company, 2 Watts and Sug., 159.

The decision in the case of the Hartford and New Haven Railroad Company *v.* Croswell, relied on by complainant's counsel, bears strongly on this case. It involves these propositions:

1. That the directors of the original corporation could lawfully accept and exercise the additional powers conferred on them, and consequently that their acts, in pursuance of such new powers, were valid. For if not so, the old corporation remained unchanged, and the stockholder must have paid his subscription to it.

2. That a stockholder who did not consent to the change could not, against his will, be held a corporator in the modified corporation.

3. And I have no doubt that such stockholder might, by bill in chancery, presented in due time, have enjoined and prevented the acceptance of the new power, and the action under it. But he could not lie by, suffer the directors to accept the newly-conferred privileges, employ workmen and build boats, and then enjoin the corporation from paying for them. That would be this case, to which both of the above cases are alike opposed in principle; for there are cases, and this possibly one of them, in which a corporator may enjoin the corporation from doing an act, or making a contract, not within its powers at the time of its creation, but brought within them by a subsequent law. But if he consent to the contract, or acquiesce in it, until third persons have become involved, his remedy is gone. It is of that class of cases in which

equity requires the utmost vigilance and promptitude. The powers granted by the act of 1851 do not extend to a new undertaking, but to a more full and perfect means of executing the original purpose of the charter, and it is the business of the corporators to see that the additional powers are not exercised to their injury. If they neglect this, they, and not innocent third persons, must suffer the consequence of their laches.

Moss *v.* the Rosalia Lead Mining Company, 5 Hill, 141.
Jackson *v.* Lumpkin, 3 Peters, 291.
Mumma *v.* the Potomac Company, 8 Peters, 286.

Mr. Justice CAMPBELL delivered the opinion of the court.
The appellant is a stockholder of the Cleveland, Columbus, and Cincinnati Railroad Company, a corporation existing by the law of Ohio, and empowered to construct a railroad from Cleveland south, and having a capital of more than $4,300,000 distributed among above nine hundred stockholders. The appellant complains, that this corporation, in April, 1854, illegally endorsed a guaranty upon four hundred bonds of one thousand dollars each, with interest coupons at the rate of seven per cent. per annum, payable to Elias Fossett or bearer in New York, in 1869, that had been issued in that month by the Columbus, Piqua, and Indiana Railroad Company, and which were also endorsed by the Bellefontaine and Indiana Railroad Company, and the Indianapolis and Bellefontaine Railroad Company, to the prejudice of the stockholders, and the burden of the resources of the said Cleveland corporation. The object of the bill was to obtain a decree to restrain the company, pending the suit, from paying the interest, and upon a declaration of the illegality of the bonds, to enjoin the corporation from applying any of its effects to their redemption.

The three defendants are holders of five of the bonds, who have availed themselves of the invitation of the bill to all their class to become defendants, and who assert that they are bona fide holders, and that their securities are valid obligations of the company. This issue of the obligations of these four corporations originated in a negotiation among their officers, in

1854, to determine upon a uniform gauge for all their roads, and to promote intimate connections in their transit operations. :

The Piqua road and the Indianapolis road were projected to extend from Columbus to Indianapolis, (one hundred and eighty-five miles,) and were partially finished at a gauge of four feet eight and one-half inches, and had agreed to maintain this gauge for their common interest. At Columbus they were to connect with roads of the same gauge, leading through Ohio and Pennsylvania to Philadelphia.

The Cleveland and the Bellefontaine railroads were constructed upon the Ohio gauge, of four feet ten inches, and the companies were interested to detach the other corporations from their Pennsylvania connection, and to combine them with their own and other companies, whose roads passed through Cleveland, along the shores of the lakes into New York, and connected there with the railroad and canal communications of that State. The Piqua road was at this time finished only forty-six miles, and the company was embarrassed, and their work suspended, for want of money. The Indianapolis company were willing to change the gauge of their road to the Ohio pattern, but were withheld by their contract with the Piqua Company. In January, 1854, the Piqua Company appointed a committee from their board of directors to negotiate for money or securities sufficient to complete their road, and to discharge their debts, other than bond debts, and were authorized to prepare six hundred bonds of one thousand dollars each, of the usual form, to be secured by a mortgage, being the third mortgage of their franchises and road. They were also empowered to determine the gauge of the road, and either to maintain their existing connections, or to consent to the adoption of the Ohio gauge in conjunction with the Indianapolis Company.

This committee opened their negotiations in Philadelphia, but pending these the vice president of the company (Dennison) "sounded the inclinations." of the Cleveland Company, by intimating that if that company would endorse a portion of the bonds, and take some of the stock of the Piqua Company, the Pennsylvania connection would be abandoned. Some assurance having been given by the president of the Cleveland

Company to him, he, with the financial agent of the company (Niel) arranged a contract with the committee of the Piqua Company to purchase the six hundred bonds, to guaranty a subscription for $50,000 of their stock at par, and to assume the control of the settlement of all controversies and questions concerning the gauge of the road. These negotiations were pending from the first week in February until the 25th of the month, when the contract was reduced to writing, and the price to be paid settled at $305,000. On the 7th of March, 1854, Dennison and Niel concluded a contract with the three corporations, Cleveland, Indianapolis, and Bellefontaine, by which they consented to the permanent adoption of the Ohio gauge for the Piqua and Indianapolis roads, and those corporations agreed to guaranty four hundred of the bonds of the Piqua Company before mentioned, and to subscribe for thirty thousand dollars of their stock. This contract was reported shortly after to the boards of the several corporations, and approved, and the bonds were issued and endorsed, and the stock subscribed for in April, 1854. The tracks of the several roads were altered to conform to this arrangement shortly after. The negotiations and contracts of Dennison and Niel were for their own account and benefit. The testimony is conclusive of the fact that the members of the Piqua board were ignorant of the assurances they had received of the disposition of the Cleveland and other companies to enter into such engagements. Dennison had been a director of this company from its organization; but before signing the contract of the 25th February, with the Piqua Company, he exhibited a written resignation, and that resignation was entered upon the minutes of the board before the approval of the contract or the issue of the bonds to him and his associate.

This transaction was reported to the stockholders of the endorsing corporations in July, 1854, and accepted by them as the act of the company. The board of directors of the Cleveland Company, on the 16th June, resolved, that there should be submitted to a vote of the stockholders, at a meeting on the 1st July proximo, four propositions for the aid of other roads desiring to form a connection with that company, under the

4th section of a statute of Ohio, passed 3d March, 1851. Among these was the endorsement of four hundred bonds of the Piqua Company. Notice was given of this meeting by advertisement in the daily papers of Cleveland and Columbus, and a daily paper in New York, but it did not disclose the object of the meeting. Above eighteen thousand shares of stock were represented, and the following resolution was adopted without a dissenting vote:

Resolved, "That the endorsement jointly and severally with the Bellefontaine and Indiana Railroad Company, and the Indianapolis and Bellefontaine Railroad Company, of four hundred thousand dollars of the third mortgage bonds of the Columbus, Piqua, and Indianapolis Railroad Company, by order of the board, March 6th, 1854, be and the same is approved, adopted, and sanctioned, by this meeting, as the proper act of this company." But, although there was no dissent in the vote, there was dissatisfaction openly expressed by the proxy of the appellant, and of a majority of the stockholders represented at the meeting, and who declined to vote on the resolution. The bonds were offered for sale in the city of New York in the summer of 1854 and the spring of 1855, under an uncontradicted representation of their validity through the votes above mentioned, and were freely purchased at fair prices. The interest was paid by the Piqua Company until October, 1855, when the instalment due in that month was discharged by the endorsers in equal proportions. In the spring of 1856, the Piqua Company having become insolvent, the appellant served a notice upon the Cleveland Company not to pay any portion of the principal and interest that might become due on the bonds, and required them to sue for the cancellation of their guaranty, and demanded his share of the profits of the company, without the reservation of any part for the payment of the bonds, and immediately after filed the bill in this cause.

He contends, that the sale by the Piqua Company to Dennison and Niel is void, under a statute of Ohio that prohibits any director of a railroad company to purchase, either directly or indirectly, any shares of the capital stock, or any of the

bonds, notes, or other securities, of any railroad company of which he may be a director, for less than the par value thereof; and it declares: "That all such stocks, bonds, and notes, or other securities, that may be purchased by any such directors for less than the par value thereof, shall be null and void."

He insists that the endorsement of the bonds of the Piqua Company was of no advantage to the Cleveland Company, but was merely to consummate the success of a speculation of Dennison and Niel—a speculation reprobated by the law of Ohio; that the Cleveland Company were not empowered by their charter to guaranty the contracts of corporations or individuals; that this endorsement was not required for the construction of the road, or in the course of the business of the company, or to promote an end of the incorporation; and that none of the acts of the General Assembly of Ohio authorize it.

He denies any efficacy to the vote of the stockholders in July, 1854, because the notice was insufficient, in the length of the time and in the failure to disclose the purpose of the call; that more than one-half of the stock of the company was not represented, and two-thirds of that present did not vote, for the want of proper information and counsel on the subject. That the meeting were ignorant of material facts; they were not advised of the relations of Dennison and Niel to the Piqua Company, and their connection with the bonds, when the vote was taken; and were deceived as to the condition of the Piqua Company. He avers that the bondholders are chargeable with notice of the fact that the endorsement was made before the meeting of the stockholders, and by the authority of the directors only.

The testimony does not convict the defendants—the bondholders—of complicity in the negotiations or contracts that preceded the issue of the bonds, nor does any equivocal circumstance appear in their purchase of those securities. It is proved that it is a common practice for railroad corporations to make similar arrangements to enlarge their connections and increase their business. The Cleveland Company had encouraged this practice by precept and example. In a report of their board of directors, in January, 1854, the company

were informed of their establishment of a line of first-class steamboats between Cleveland and Buffalo, and of their guaranty of the bonds of other companies for three hundred thousand dollars; of subscriptions for stock to the extent of one hundred thousand dollars, and of promised aid to still another company. They say: "These companies may need additional assistance, and others proposing to intersect ours may, by a moderate loan of money or credit, be enabled to finish their roads, and establish with us business relations, for the mutual benefit of both parties, while the advances on our part may be made safe and remunerative. Unless advised of your disapprobation, the board will continue to pursue this policy."

No such disapprobation was expressed as to check the board of directors until the guaranty of these bonds had been sanctioned, in July, 1854, at a meeting of the stockholders. The discussion was confined to the circle of the corporation, until after the failure of the Piqua Company to pay a second instalment of interest. Then the appellant filed this bill.

The frame of the bill implies that this contract exceeds the power of the corporation, and cannot be confirmed against a dissenting stockholder. His authority to file such a bill is supported upon this ground alone. Dodge *v.* Walsey, 18 How., 331; Mott *v.* Penn. R. R. Co., 30 Penn., 1; Manderson *v.* Commercial Bank, 28 Penn., 379.

The usual and more approved form of such a suit being that of one or more stockholders to sue in behalf of the others: Bemon *v.* Rufford, 1 Simon, N. S., 550; Winch *v.* Birkenhead H. Railway Co., 5 De G. and S., 562; Mosley *v.* Alston, 1 Phil., 790; Wood *v.* Draper, 24 Barb. N. Y. R.

A court of equity will not hear a stockholder assert that he is not interested in preventing the law of the corporation from being broken, and assumes that none contemplate advantages from an application of the common property that the constitution of the company does not authorize.

The powers of the Cleveland Company are vested in a board of directors chosen from the company. They are authorized to construct and maintain their road, and for that purpose can employ the resources and credit of the company, and execute

the requisite securities, and are required to exhibit annually a clear and distinct statement of their affairs to a meeting of the stockholders. In the year 1851 a general law relating to railway companies empowered them "at any time, by means of their subscription to the capital stock of any other company, or *otherwise*, to aid such company in the construction of its railroad, for the purpose of forming a connection of said last-mentioned road with the road owned by the company furnishing such aid; * * * and empowered any two or more railroad companies whose lines are so connected to enter into any arrangement for their common benefit, consistent with and calculated to promote the objects for which they were created: Provided, that no such aid shall be furnished nor any * * * arrangement perfected until a meeting of the stockholders of each of said companies shall have been called by the directors thereof, at such time and place and in such manner as they shall designate; and the holders of at least two-thirds of the stock of such company represented at such meeting in person or by proxy, and voting thereat, shall have assented thereto."

This section was re-enacted in the following year, in a general act for "the creation and regulation of incorporated companies in Ohio," which last act provides that "any existing company might accept any of its provisions, and when so accepted, and a certified copy of their acceptance filed with the Secretary of State, that portion of their charters inconsistent with the provisions of this act shall be repealed." Curwen's Ohio Laws, 949, 1110.

It is contended, that neither of these acts was accepted by the Cleveland Company; that the act of 1852 superseded that of 1851, and that the former could be accepted and become obligatory upon the company only in the mode it prescribed. Both of these are general acts, and were designed to enlarge the faculties of these corporations, so as to promote their utility, and to enable them to accomplish with more convenience the objects of their incorporation. This act of 1851 does not divest any estate of the company, or make such a radical change in their constitution as to authorize the mem-

bers to say that its adoption without their consent is a dissolution of the body. But for an intimation in an opinion of the Supreme Court of Ohio (Chapman & Harkness *v.* M. R. and L. E. R. R. Co., 6 Ohio R., N. S., 119) to the contrary, we should have been inclined to adopt the conclusion that the act of March, 1851, might be operative without the specific or formal assent of the corporations to which it refers, and was not superseded by the act of 1852, as to pre-existing corporations. Everhart *v.* P. and U. C. R. R. Co., 28 Penn. R., 340; Gray *v.* Monongahela N. Co., 2 W. and S., 156; Great W. R. W. Co. *v.* Rushant, 5 De G. and S., 290.

The jurisprudence of Ohio is averse to the repeal of statutes by implication; and in the instance of two affirmative statutes, one is not to be construed to repeal the other by implication, unless they can be reconciled by no mode of interpretation. Cass *v.* Dillon, 1 Ohio R., N. S., 607.

The learned compiler of the laws of Ohio retains the act of 1851 as valid, in respect to the corporations then existing. But as between the parties on this record, the acceptance of those acts may be inferred from the conduct of the corporators themselves. The corporation have executed the powers and claimed the privileges conferred by them, and they cannot exonerate themselves from the responsibility, by asserting that they have not filed the evidence required by the statute to evince their decision. The observations of Lord St. Leonards in the House of Lords, (Bargate *v.* Shortridge, 5 H. L. Ca., 297,) in reference to the effect of the conduct of a board of directors as determining the liability of a corporation, are applicable to this corporation, under the facts of this case. "It does appear to me," he says, "that if, by a course of action, the directors of a company neglect precautions which they ought to attend to, and thereby lead third persons to deal together as upon real transactions, and to embark money or credit in a concern of this sort, these directors cannot, after five or six years have elapsed, turn round, and themselves raise the objection that they have not taken these precautions, and that the shareholders ought to have inquired and ascertained the matter. * * * The way, therefore, in which I

propose to put it to your lordships, in point of law, is this: the question is not whether that irregularity can be considered as unimportant, or as being different in equity from what it is in law, but the question simply is, whether, by that continued course of dealing, the directors have not bound themselves to such an extent that they cannot be heard in a court of justice to set up, with a view to defeat the rights of the parties with whom they have been dealing, that particular clause enjoining them to do an act which they themselves have neglected to do."

This principle does not impugn the doctrine that a corporation cannot vary from the object of its creation, and that persons dealing with a company must take notice of whatever is contained in the law of their organization. This doctrine has been constantly affirmed in this court, and has been engrafted upon the common law of Ohio. Pearce *v.* M. and I. R. R. Co., 21 How., 441; Strauss *v.* Eagle Ins. Co., 5 Ohio, N. S., 59. But the principle includes those cases in which a corporation acts within the range of its general authority, but fails to comply with some formality or regulation which it should not have neglected, but which it has chosen to disregard.

The instances already cited of the course of dealing of this corporation, and others of a similar nature, of which there is evidence in the record, sufficiently attest that the corporation accepted the acts of 1851 and 1852 as valid grants of power; and it would be manifestly unjust to allow it to repudiate the contracts which it has made, because their acceptance of these grants has not been clothed in an authentic form. The Supreme Court of Ohio have recognised the obligation of corporators to be prompt and vigilant in the exposure of illegality or abuse in the employment of their corporate powers, and have denied assistance to those who have waited till the evil has been done, and the interest of innocent parties has become involved. Chapman *v.* Mad River R. R. Co., 6 Ohio, N. S., 119; The State *v.* Van Horne, 7 Ohio, N. S., 327.

We conclude, that the validity of the contract of the Cleveland corporation, under the circumstances, must be determined on the assumption that it was authorized to exert the

power conferred in the fourth section of the act of March, 1851, and 24th section of the act of May, 1852.

In deciding upon the validity of this contract, we deem it unimportant to settle whether Dennison was a director of the Piqua Company the 25th February, 1854, when he signed the contract with the committee of the Piqua board of directors; or whether that contract was affected by its ratification by the board after his resignation was entered upon the minutes, or by the subsequent consummation of the contract, in the reciprocal transfer of the securities and payment of the consideration; or whether, as matter of law, the bonds of the Piqua Company, commercial in their form, payable to another party, and issued after his resignation, are null and void.

The contract of the guarantors endorsing the bonds is a distinct contract, and may impose an obligation upon them independently of the Piqua Company. In the absence of a personal incapacity of Dennison to deal with his principal, the issue of the bonds by the directors of the Piqua Company is an ordinary act of administration; and bonds in such form, it is admitted, "challenge confidence wherever they go.". We perceive no illegality in their delegation to them of the power to determine whether the Ohio or Pennsylvania gauge should be adopted, or their sale of the privilege to adjust the controversies and questions relating to it. Their adoption of the Ohio gauge was a solution of all the difficulties; it enabled the Indianapolis Company to adopt it; it superinduced the resulting consequence of running connections among the four corporations; it secured profits to the guarantors; it imposed the burden of relaying their track upon the Piqua Company. Their contract to adopt this gauge and to form the corresponding connections is a valuable consideration, and the Piqua Company have fulfilled the engagements that Dennison and Niel were authorized to stipulate on their behalf. There is testimony that the bargain was a hard one for the guarantors, and argument that it was probably an unjust one, and possibly fraudulent in reference to the stockholders of the Cleveland Company. But the bill is framed, not to obtain relief from error or fraud in the administration of the powers of the com-

pany by their trustees, but against the exercise of powers that did not belong to the corporation, and which the body could not confirm, except by a unanimous vote. Foss *v.* Harbottle, 2 How., 461; 2 Phil. Ch. R., 740.

We proceed to consider of the effect of the sanction given to the arrangements of the Cleveland Company, through Dennison and Niel, with the Piqua Company, by the vote of the meeting in July, 1854. It is objected that the notice of this meeting was insufficient, and that, unprepared as the corporators were, the proxy appointed by the non-resident stockholders was overpowered by the heat and passion of the directors and their adherents. There is some force in the complaint that this meeting was not conducted with a due respect for the social rights of a portion of the stockholders. But the time, place, and manner of the meeting were appointed by the directors, as the act of 1851 permits. The proxy of the appellant was there, exhibited his instructions, discussed the propositions submitted, and declined to vote, when his vote would have controlled the action of the meeting. Since that time, several annual meetings have been held, at which the appellant was represented. The circumstances of the contract and its effects have been developed, and yet the resolution sanctioning this contract has not been rescinded. It may be that among the stockholders, and within the corporation, the cause of this procrastination and hesitancy to act upon the subject may be estimated properly. But we are to regard the conduct of the corporation from an external position. The community at large must form their judgment of it from the acts and resolutions adopted by the authorities of the corporation and the meeting of the stockholders, and by their acquiescence in them. These negotiable securities have been placed on sale in the community, accompanied by these resolutions and votes, inviting public confidence. They have circulated without an effort on the part of the corporation or corporators to restrain them, or to disabuse those who were influenced by these apparently official acts. Men have invested their money on the assurance they have afforded.

A corporation, quite as much as an individual, is held to a

careful adherence to truth in their dealings with mankind; and cannot, by their representations or silence, involve others in onerous engagements, and then defeat the calculations and claims their own conduct had superinduced. The opinion of the court is, that the injunction granted upon the bill of the appellant was improvidently granted, and that he is not entitled to the relief he has sought; and that the decree of the Circuit Court dissolving the injunction and dismissing the bill is correct, and must be affirmed.