WEST PENN CHEMICAL & MFG. CO. v. PRENTICE.

(Circuit Court of Appeals, Third Circuit. November 15, 1916.)

No. 2109.

1. TRIAL ⊂⊃343—VERDICT—EFFECT.

A verdict resolves disputed questions of fact in favor of the successful party.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 809–812; Dec. Dig. ⊂⊃343.]

2. CORPORATIONS ⊂⊃455—AGREEMENT—SEALING.

Though some months after plaintiff and the president of a corporation had entered into an agreement which was signed only by the president, the corporate seal not being affixed, plaintiff, who in the interim had become a director, induced the then secretary to affix the corporate seal and attest the paper, the original status of the instrument was unchanged.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1801–1803; Dec. Dig. ⊂⊃455.]

3. CORPORATIONS ⊂⊃406(2)—PRESIDENT—POWERS OF.

While the president of a corporation is its general administrative agent, he cannot bind the corporation to a contract not within the corporate powers.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1612; Dec. Dig. ⊂⊃406(2).]

4. CORPORATIONS ⊂⊃376—STOCK—RIGHT TO PURCHASE.

Generally, if its power be not restricted by charter or general law, a corporation may buy its own stock, if the interests of creditors are not adversely affected.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1530; Dec. Dig. ⊂⊃376.]

5. COURTS ⊂⊃366(7)—FEDERAL COURTS—PRECEDENTS—DUTY TO FOLLOW.

A decision of a state court construing a state statute, limiting the powers of local corporations, is binding on the federal courts.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 962; Dec. Dig. ⊂⊃366(7).]

6. CORPORATIONS ⊂⊃376—AUTHORITY OF—RIGHT TO BUY IN STOCK.

General Corporation Law (22 Del. Laws, c. 167) § 19, declares that every corporation shall have power to purchase, hold, sell, and transfer shares of its own capital stock, provided that no such corporation shall use its funds or its property for the purchase of its own shares, when such use would cause any impairment of the capital of the corporation. At the time a corporation contracted with one who entered its service as a salesman and purchased a number of shares, to repurchase the shares on the demand of the salesman at any time within a year, the capital of the corporation was already impaired; its funds and property being worth considerably less than its purported capital. *Held* that, as the statute forbids a corporation to buy in its own stock which would cause an impairment of its capital, the agreement was unenforceable because it would cause a further impairment to the injury of creditors.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1530; Dec. Dig. ⊂⊃376.]

7. CORPORATIONS ⊂⊃388(2)—PURCHASING OWN STOCK—PUBLIC POLICY.

Where a corporation was not, under the statute law of its domicile, authorized to buy in its own shares, its capital then being impaired, no estoppel can be raised whereby enforcement of an agreement to buy in its shares can be had; for, while a corporation having received the

benefit may be estopped to deny an ultra vires agreement executed by the other party, the rule is otherwise as to an agreement against public policy.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1557; Dec. Dig. ☞388(2).]

In Error to the District Court of the United States for the Western District of Pennsylvania; Charles P. Orr, Judge.

Action by George D. Prentice against the West Penn Chemical & Manufacturing Company. There was a judgment for plaintiff, and defendant brings error. Affirmed on condition that plaintiff enter remittitur; otherwise, reversed and remanded.

Robbins & Wyant, of Greensburg, Pa., and O. P. Robertson, of Pittsburgh, Pa., for plaintiff in error.

Ward Bonsall, of Pittsburgh, Pa., for defendant in error.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

McPHERSON, Circuit Judge. This suit between citizens of different states is founded on a written contract signed by George D. Prentice and by the president of the West Penn Company on January 3, 1914. Whether the instrument was binding throughout upon the company is the decisive question on this writ.

[1] Two subjects are dealt with by the writing. First, Prentice is hired as a salesman for one year at a specified salary, and undertakes to give all his services and to perform his duties to the utmost of his skill and ability for the profit and advancement of the company. Upon this branch of the case, little need be said. The employment was the act of the president, but his power to hire a salesman for a year is not denied, and the verdict has settled the disputes arising out of the plaintiff's discharge before the end of the period, and out of his alleged failure to fulfill his duties. The verdict is itemized, and we are able to say with certainty that $208.07 is awarded him on this account. The remainder of the verdict amounts to $2,643.75, and belongs to the other branch of the case, which will now receive our attention.

[2, 3] The writing goes on to provide that Prentice is to buy 250 shares of capital stock at par, paying $2,500 cash therefor, and the company is to give Prentice an option to buy 250 shares additional within six months; but, if Prentice should not be satisfied with the investment, the company agrees to dispose of 250 shares at par at the expiration of the contract, January 3, 1915; "notice of intention of disposal to be given" by Prentice to the company 30 days previously. The option on the second 250 shares lapsed, but Prentice paid in full for the first 250, and gave the required notice. The company neither disposed of the stock nor paid its par value, and in the following February this suit was brought on the contract.

Did such an agreement bind the company? It is denied that the writing is in any proper sense a corporate act, and this aspect of the case is the first reason urged upon us for reversal. While the writing recites that it is made between the company and Prentice, and while the body of it purports to bind the company, it was not executed as a corporate instrument should be executed. The attesting clause is: "In

witness whereof the parties to these presents have hereunto set their hands and seals the day and year first above written." And the signature is: "West Penn Chemical & Mfg. Co., [Signed] H. Messmer, Pres. [Seal.]" The corporate seal was not affixed and the secretary took no part in the execution, and, so far as appears, had no share in the transaction. Moreover, on the undisputed evidence no such contract was ever authorized by the stockholders or by the directors, and the instrument was therefore executed by the president on his own responsibility. About nine months afterwards, Prentice, who had meanwhile become a director, persuaded the person, who was then the secretary, to affix the corporate seal and to attest the paper; but neither were these acts authorized by the corporation, and they added nothing to the original status of the instrument. Taking the writing therefore as it stood on January 3d, we think it should be regarded as the act of the president undertaking to bind the company, and in that aspect we shall deal with it.

No doubt the president of a corporation is its general administrative agent, although his powers are by no means without limits. But, even if we assume for the purposes of this case that Messmer might fairly be presumed to have authority to sign such a writing in the name of his company without other evidence of corporate assent, such an act could not bind the company unless the contract were within the corporate powers. 7 Ruling Case Law, § 436; Wait v. Nashua Ass'n, 14 L. R. A. 356, note; Carney v. Insurance Co., 49 L. R. A. 472, note; Lloyd v. Matthews, 7 L. R. A. (N. S.) 376, note. If the corporation itself could not make the contract, Messmer was equally powerless, and we are thus brought to consider whether the West Penn Company itself could directly have made the agreement. This is the point on which the company mainly relies, and in order to appreciate the argument we must turn to the law of Delaware, by which state the company's charter was granted.

[4-6] The prevailing rule in the United States appears to be that a corporation may buy its own stock if the interest of creditors be not adversely affected, and if its power to buy be not restricted by its charter or by general law. 7 Ruling Case Law, § 528 et seq. But, if one examines the cases cited on this subject in the notes to Buckeye Co. v. Harvey, 18 L. R. A. 254, Hall v. Henderson, 61 L. R. A. 621, McGregor v. Fitzpatrick, 25 L. R. A. (N. S.) 50, and Schulte v. Land Co., 44 L. R. A. (N. S.) 156, we think he will conclude that the decision of a particular case depends so largely on its own facts that the foregoing statement of the rule is valid only in a general sense, and admits of several exceptions. It seems safe to say that, where a statute restricts the power to buy, the restriction must be obeyed, although it is true that difficult questions may be met in the effort to determine the statute's meaning and scope. That such a restriction exists by the general corporation law of Delaware (25 Del. Laws, c. 154, § 1) appears in section 19, which provides as follows:

"Every corporation organized under this chapter shall have the power to purchase, hold, sell and transfer shares of its own capital stock; *provided that no such corporation shall use its funds or property for the purchase of*

*its own shares of capital stock when such use would cause any impairment of the capital of the corporation."*

This gives the power to buy, but a restricted power; the corporate funds may not be so used when the purchase would impair the company's capital. What this means has been recently decided by the Chancellor of Delaware in Re International Radiator Co., 92 Atl. 255. In that case Harris had subscribed for $5,000 of the company's stock, giving his notes therefor. The company had agreed to sell the stock for him at $7,500 before a specified date, but had failed to do so. Harris had paid the notes (which the company had discounted) and thereupon presented a claim for $7,500 in the subsequent receivership. The Chancellor held that the legal effect of the contract was to bind the company to repurchase the shares at $7,500 in case it should be unable to sell them at that price, and then went on to consider the validity of the transaction. Upon that point the opinion has this to say concerning section 19 of the Delaware statute:

"The claim is further affected by the statute in Delaware. By the General Corporation Act, under which the company was incorporated, the company could not use its funds or property to purchase shares of its own capital 'when such use would cause an impairment of the capital of the corporation.' At the time when the agreement was made with Harris, and at the time the receiver was appointed, the capital stock of the company was about $400,000, presumably issued for value, while its assets were appraised at $13,000 by the appraisers in the receivership cause. It is said that about $75,000 of stock was issued for patents, etc. But even adding this sum to the appraised value of the assets of the company, still the payment of the claim of Harris from the assets to come into the hands of the receiver will, of course, deplete the capital.

"Therefore, the question is whether an agreement of a corporation to sell shares of its own capital stock for a stockholder is not, as to a claim by the stockholder for the sum of money at which the company agreed to sell it, a purchase by the company of such shares.

"A claim for the price at which the company agreed to sell the shares is certainly equivalent to an agreement to purchase at that price, and equally within the spirit of the act and equally unlawful, if the enforcement of such an agreement impaired the capital of the company. Any one dealing with the corporation is bound to know the limitations put on it by the statute under which it was created. In the statute the impairment of the 'capital' of the company is mentioned. As here used, this means the reduction of the amount of the assets of the company below the amount represented by the aggregate outstanding shares of the capital stock of the company. In other words, a corporation may use only its surplus for the purchase of shares of its own capital stock. 'Capital' does not, in this connection, mean the assets of the company, for, of course, the assets are reduced when any of it is used by a corporation to purchase shares of its own capital stock. It must have some other meaning then. The statute must mean, therefore, that the funds and property of the company shall not be used for the purchase * * * of its own capital stock when the value of its assets is less than the aggregate amount of all the shares of its capital stock. A use by a corporation of its assets to purchase shares of its own capital stock under such conditions impairs the capital of the company.

"As these conditions existed when the contract was made between Harris and the International Radiator Company the contract is not now enforceable against the assets in the hands of the receiver, and the claim is disallowed."

We think it our duty to follow this decision upon the construction and effect of the Delaware statute, and we find it a controlling authority in the present case. Both at the time the writing was signed, and in

January, 1915, when the West Penn Company was called upon to re-purchase the stock, its capital would have been impaired by the use of its funds or property for that purpose. Its capital was $62,500, and upon the undisputed evidence its funds and property at all times during the year were much less than this sum. In a word, its capital was already impaired in January, 1914, and continued so to be, and this is true even if we assume that the paid-in capital was only about $49,000, as the plaintiff's brief asserts. The agreement to repurchase being forbidden by the statute, and the present suit being directly on the contract, the plaintiff cannot recover.

[7] Against this conclusion the plaintiff's chief objection is that the company is estopped from setting up such a defense, and his brief cites many cases on the general subject. We need not review them, nor discuss the doctrine of estoppel in connection with ultra vires acts. Assuming the general rule to be that, where an ultra vires agreement has been executed by the other party in good faith, and where the corporation has derived from the transaction the benefit it desired, the corporate party may be estopped to deny its authority to contract, nevertheless we are of opinion that the particular situation before us falls within a recognized qualification to the rule, namely, that the corporation is not estopped to set up the defense if the agreement has been prohibited by statute, or is immoral, or is otherwise contrary to public policy. So far as the federal courts are concerned, the controlling doctrine is thus expressed by the Supreme Court in De La Vergne Co. v. Savings Institution, 175 U. S. at page 58, 20 Sup. Ct. at page 25, 44 L. Ed. 65:

"Whatever doubts might have been once entertained as to the power of corporations to set up the defense of ultra vires to defeat a recovery upon an executed contract, the rule is now well settled, at least in this court, that, where the action is brought upon the illegal contract, it is a good defense that the corporation was prohibited by statute from entering into such contract, although in an action upon a quantum meruit it may be compelled to respond for the benefit actually received.

"The earliest case in which this doctrine is distinctly laid down is that of Pearce v. Madison & Indianapolis Railroad, 21 How. 441 [16 L. Ed. 184], in which it appears that two railroad companies, which had been consolidated, gave their promissory notes in payment for a steamboat to run in connection with the railroads. It was held that, as there was no authority in the railroad companies to engage in running steamboats, there could be no recovery on the notes, and that, as the plaintiff was not the owner of the boat and had sued upon the notes as an indorsee, there could be no recovery. The same doctrine has been applied to leases ultra vires a corporation, and it has been uniformly held that there could be no recovery upon the lease itself, though there might be in an action for use and occupation of the property. Pittsburgh, Cincinnati, etc., Railway v. Keokuk & Hamilton Bridge Co., 131 U. S. 371, 384 [9 Sup. Ct. 770, 33 L. Ed. 157]; Central Transportation Co. v. Pullman's Palace Car Co., 139 U. S. 24, 48 [11 Sup. Ct. 478, 35 L. Ed. 55; Pullman's Palace Car Co. v. Central Transp. Co.] 171 U. S. 138 [18 Sup. Ct. 808, 43 L. Ed. 108]; McCormick v. Market Bank, 165 U. S. 538, 550 [17 Sup. Ct. 433, 41 L. Ed. 817]; Thomas v. Railroad Co., 101 U. S. 71 [25 L. Ed. 950]; California Bank v. Kennedy, 167 U. S. 362 [17 Sup. Ct. 831, 42 L. Ed. 198]; Marble Co. v. Harvey, 92 Tenn. 116 [20 S. W. 427, 18 L. R. A. 252, 36 Am. St. Rep. 71]; Union Pacific Railway v. Chicago, Rock Island & Pacific Ry. Co., 163 U. S. 564 [16 Sup. Ct. 1173, 41 L. Ed. 265].

"The doctrine that no recovery can be had upon the contract is based upon the theory that it is for the interest of the public that corporations should

not transcend the limits of their charters; that the property of stockholders should not be put to the risk of engagements which they did not undertake; that, if the contract be prohibited by statute, every one dealing with the corporation is bound to take notice of the restrictions in its charter, whether such charter be a private act or a general law under which corporations of this class are organized. Zabriskie v. Cleveland, Columbus, etc., Railroad, 23 How. 381, 398 [16 L. Ed. 488]; Thomas v. Railroad Co., 101 U. S. 71 [25 L. Ed. 950]; Pennsylvania Co. v. St. Louis, Alton & Terre Haute Railroad, 118 U. S. 290 [6 Sup. Ct. 1094, 30 L. Ed. 83]; Oregon Ry. Co. v. Oregonian Ry. Co., 130 U. S. 1, 25 [9 Sup. Ct. 409, 32 L. Ed. 837]; Railroad Companies v. Keokuk Bridge Co., 131 U. S. 371, 384 [9 Sup. Ct. 770, 33 L. Ed. 157].

"As the action in this case is upon the contract, and as the contract was prohibited by the charter of the refrigerating company, there can be no recovery upon it."

See, also, Bank v. Converse, 200 U. S. 439, 26 Sup. Ct. 306, 50 L. Ed. 537.

It follows that on this branch of the case the District Court should have given binding instructions in favor of the defendant; but, if possible, we desire to avoid a second trial on the other branch, and therefore we shall not now enter a judgment of reversal. If, on or before the 8th day of January, 1917, the plaintiff remit so much of the judgment as exceeds the sum of $208.07, we will affirm the judgment for the remainder, and will then dispose of the question of costs. If the remittitur be not filed, we shall be obliged to reverse the judgment generally and send the case back for another trial.

(See opinion of Judge Bradford, delivered in the Circuit Court of Delaware in 1897, Hamor v. Taylor-Rice Co., 84 Fed. 392.)