## PITTSBURGH, CINCINNATI AND ST. LOUIS RAILWAY COMPANY *v.* KEOKUK AND HAMILTON BRIDGE COMPANY.

## PENNSYLVANIA RAILROAD COMPANY *v.* KEOKUK AND HAMILTON BRIDGE COMPANY.

APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ILLINOIS.

Nos. 11, 13. Argued January 25, 1888. — Decided May 13, 1889.

A contract made by the president of a railroad corporation, in its behalf, and within the scope of its chartered powers, to pay certain sums to the

proprietors of a railway bridge for the use thereof, and made known to the directors and stockholders, and not disapproved by them within a reasonable time, binds the corporation.

A contract to pay certain sums for the use of a railway bridge across the Mississippi River, between Illinois and Iowa, is not *ultra vires* of a railroad corporation of Illinois or of Pennsylvania, whose road connects, by means of intervening railroads, with the bridge as part of a continuous line of transportation.

A being a railroad corporation of Ohio, Indiana and Illinois, B a railroad corporation of Pennsylvania and Ohio, and C a railroad corporation of Pennsylvania, these three corporations, for the purpose of establishing a continuous line of transportation, entered into an indenture, by which A leased its railroad to B for ninety-nine years, B covenanted to pay to A a proportion of the earnings of that road, and to assume and carry out certain transportation contracts existing between A and other companies, receiving and enjoying the benefits thereof, and C guaranteed the performance of B's covenants. Before the execution of the lease, a contract was drawn up, by which a corporation of Iowa and Illinois, authorized by its charter to build a railway bridge across the Mississippi River from Keokuk in Iowa to Hamilton in Illinois, agreed to build such a bridge, and granted to A and three other railroad corporations in perpetuity the right to use it for the passage of their trains; and they agreed to pay monthly to the bridge company stipulated tolls, and, if those should fall below a certain sum, to make up the deficiency, each contributing in proportion to the tonnage passed by it over the bridge. After the execution of the lease, and upon a formal request of the presidents of B and C in their behalf, undertaking that they should assume all the liabilities and be entitled to all the benefits of the bridge contract, as if it had been specifically named in and made part of the lease, A's president, in its behalf, executed the bridge contract, and reported to his directors that he had done so, and they never took any action upon the subject. C's president and directors, in two printed annual reports to their stockholders, declared the settled policy of the company to secure a continuous line of traffic from Philadelphia to Keokuk and westward, and stated that through B this object had been accomplished. A subsequent modification of the bridge contract, by which a deficiency in the tolls was to be borne equally by the four railroad corporations parties thereto, was executed by A's president, pursuant to a similar request and undertaking of the presidents of B and of C. The bridge was then opened for use, and was afterwards used by B and C; and the sums payable by A under the modified bridge contract for tolls and deficiencies were semi-annually demanded by the bridge company from B, and, after examination of the accounts, paid by B's comptroller for three years. *Held*, that B and C were liable to the bridge company for the amount of subsequent deficiencies payable by A under that contract, whether the lease was valid or invalid.

THIS was a bill in equity, filed July 25, 1881, by the Keokuk and Hamilton Bridge Company against the Pittsburgh, Cincinnati and St. Louis Railway Company and the Pennsylvania Railroad Company, to recover deficiencies in tolls for the use of the plaintiff's bridge, under a contract executed at the request of the presidents of those two railroad companies by the Columbus, Chicago and Indiana Central Railroad Company, which was made by amendment a party to the bill.

The Keokuk and Hamilton Bridge Company was a corporation organized under the laws of Iowa and of Illinois. The Pennsylvania Railroad Company was a corporation organized under the laws of Pennsylvania. The Pittsburgh, Cincinnati and St. Louis Railway Company was formed in 1868 by the consolidation of the Pan-Handle Company, a corporation organized under the laws of Pennsylvania, the Holiday's Cove Railroad Company, a corporation organized under the laws of West Virginia, and the Steubenville and Indiana Railroad Company, a corporation organized under the laws of Ohio. The Columbus, Chicago and Indiana Central Railroad Company was a corporation formed in 1867 by the consolidation of the Columbus and Indiana Central Railroad Company, a corporation existing under the laws of Ohio and Indiana, and the Chicago and Great Eastern Railway Company, a corporation existing under the laws of Indiana and Illinois.

The railroads of the Pennsylvania Railroad Company from Philadelphia to Pittsburgh in Pennsylvania, of the Pittsburgh, Cincinnati and St. Louis Railway Company from Pittsburgh to Columbus in Ohio, of the Columbus, Chicago and Indiana Central Railroad Company from Columbus to the State line between Indiana and Illinois, and of the Toledo, Peoria and Warsaw Railway Company from that State line to Hamilton in Illinois, with the bridge of the Keokuk and Hamilton Bridge Company across the Mississippi River between Hamilton and Keokuk, and the road of the Des Moines Valley Railroad Company from Keokuk to Des Moines in the State of Iowa, form a continuous line of railroad transportation from Philadelphia, on the east, to Des Moines, on the west. For the sake of brevity, we shall speak of those companies respec-

tively as the Pennsylvania Company, the Pittsburgh Company, the Indiana Central Company, the Peoria Company, the Bridge Company and the Des Moines Company.

The bridge was built under a contract, dated January 19, 1869, made by the Bridge Company with the Indiana Central Company, the Peoria Company, the Des Moines Company, and a fourth railroad company (the Toledo, Wabash and Western Railway Company) whose railroad connected with the bridge at Hamilton. By that contract, the Bridge Company agreed to begin to construct forthwith across the Mississippi River at Keokuk, and to complete by January 1, 1870, "a substantial wrought-iron bridge, suitable for the running of railway trains;" "to lay a track upon said bridge, and connect the same with railways belonging to the parties hereto, in such manner and at such points as may hereafter be agreed upon;" and "to maintain and keep in repair in perpetuity the said bridge and track, so that trains may safely cross at all times, except when repairs make it necessary that crossing should be temporarily suspended, or when it shall be necessary to have the draw open for the passage of boats;" and granted to those four railroad companies, in perpetuity, the right to use the bridge for the purpose of passing their trains across the Mississippi River; and they agreed to pay monthly stipulated rates for the transportation of passengers and freight, and, if the gross amount of the rates for freight for any year should fall below the sum of $80,000, making up the deficiency, each of the four railroad companies contributing in proportion to the tonnage passed by it over the bridge; for which, by a subsequent modification of the contract in June, 1871, was substituted one fourth of such deficiency.

This suit was brought to recover from the Pittsburgh Company and the Pennsylvania Company such deficiencies in the sums payable by the Indiana Central Company under the modified bridge contract since September 1, 1874, amounting to $118,076.89, and interest. The Circuit Court entered a decree for the plaintiff, in accordance with the prayer of the bill; and the Pittsburgh and Pennsylvania Companies each appealed to this court.

The facts on which the Bridge Company sought to charge the Pittsburgh and Pennsylvania Companies for these sums were as follows:

After the original bridge contract had been drawn up, and before it had been executed, the Indiana Central Company entered into an indenture with the Pittsburgh and Pennsylvania Companies, by which it leased its franchises and road, and all lands and property connected with the use thereof, to the Pittsburgh Company for ninety-nine years, and the Pennsylvania Company guaranteed the performance of all the covenants of the Pittsburgh Company as lessee.

The thirteenth and the sixteenth articles of that lease clearly manifest that one of its chief objects was to establish a continuous line for quick transportation from Pennsylvania to the West, and to procure freight and passengers at each end of the line; and they contain special provisions calling for action of the Pennsylvania Company, as well as of the Pittsburgh Company, so as to promote that object.

The sixteenth article of the lease declares that it is in consideration of the benefits so accruing to the Pennsylvania Company, by reason of the covenants of the lessor and of the lessee, "in the forming, maintaining and operating of a continuous line of railway in connection with the road or roads of" the Pennsylvania Company, that this company guarantees to the Indiana Central Company that the Pittsburgh Company will keep and perform all its covenants, and that, upon its failure or default to do so, the Pennsylvania Company will, upon written notice of the kind and nature of such failure or default, keep and perform those covenants; in which event it is agreed that it shall be entitled to all the benefits that might accrue therefrom to the Pittsburgh Company.

Among those covenants of the Pittsburgh Company, as lessee, which the Pennsylvania Company thus guaranteed the performance of, were the covenant in the sixth article to pay to or for the benefit of the Indiana Central Company three tenths of the gross earnings of the property leased, and the covenant in the ninth article, by which the Indiana Central Company assigns to the Pittsburgh Company certain existing

contracts for transportation over other railroads not mentioned above, and the Pittsburgh Company "assumes, and agrees at its own risk and expense to carry out, each and all of said contracts, according to their respective tenors and legal liabilities, receiving and enjoying all benefits to be derived therefrom."

The lease was executed in behalf of each of the three companies, parties thereto, by its president and secretary, under its seal, and was approved by votes of the directors and of the stockholders of the Indiana Central Company and of the Pittsburgh Company, on or before February 1, 1869, so as to make it valid under the laws of Ohio, and the Pittsburgh Company forthwith took possession of and has since operated the railroad so leased.

The lease does not appear to have been approved by formal vote of the directors or stockholders of the Pennsylvania Company. But, immediately after its execution, the president and directors of this company, in their printed annual report to their stockholders of February 10, 1869, stated that the Pennsylvania Company controlled the railway of the Pittsburgh Company, "as an indispensable connection for the Pennsylvania Railway with the West and Southwest," by means of the ownership by the Pennsylvania Company of more than five millions of the stock and bonds of the Pittsburgh Company, and of the lease from the Indiana Central Company to the Pittsburgh Company, "guaranteed by this company;" and expressed the settled policy of the Pennsylvania Company thereby to secure a continuous line of traffic to Keokuk and westward.

The bridge contract was not one of the transportation contracts specified in the ninth article of the lease. But on February 16, 1869, the presidents of the Pittsburgh and Pennsylvania Companies, in their behalf, jointly addressed a formal letter to the president of the Indiana Central Company, referring to the bridge contract as having been under negotiation, but unexecuted by the Indiana Central Company, at the date of the final execution of the lease, and requesting him, in his official capacity, to execute the bridge contract, "it being

understood that the said lessee and Pennsylvania Railroad Company shall assume all the liabilities and obligations and be entitled to all the benefits of said bridge contract, the same as if it had been specifically named and made a part of the ninth article of the said lease."

The president of the Indiana Central Company thereupon, in its name and under its seal, executed the bridge contract, and reported to its board of directors at the next meeting, in March, 1869, that he had done so; and the board never in any way repudiated or disapproved his act or took any action upon the subject.

On February 1, 1870, an amendment of the lease, defining the gross earnings to be accounted for as the annual gross earnings of the road, after deducting, among other things, "the *pro rata* bridge tolls" and "terminal expenses allowed to other railroad corporations on through business between the East and the West," was executed by the presidents of the three companies, and approved by votes of the directors and stockholders of the Indiana Central Company and of the Pittsburgh Company.

This amendment, like the original lease, does not appear to have been approved by formal vote of the directors or stockholders of the Pennsylvania Company. But the annual report made in print by its president and directors to the stockholders a year after, on February 18, 1871, spoke of this company's control of the western traffic, through the Pittsburgh Company, and by means of the lease of the Indiana Central Railroad, as an established fact.

On June 6, 1871, the bridge contract was modified so as to have the deficiency in tolls paid to the Bridge Company by the Indiana Central Company and the three other railroad corporations, parties to that contract, one fourth each, instead of in proportion to tonnage; and the modification was executed by the president of the Indiana Central Company, pursuant to a request of the presidents of the Pittsburgh and Pennsylvania Companies, similar in terms to their request upon which the original bridge contract had been executed.

It was on June 13, 1871, after all these transactions had

taken place, that the bridge was accepted by the Bridge Company, and was opened for use; and thenceforward it was used by the Pittsburgh and Pennsylvania Companies, in the exercise of the control asserted by them under the various contracts above mentioned. From that time the Bridge Company, acting in accordance with the understanding expressed in the letters from the presidents of the Pittsburgh and Pennsylvania Companies to the president of the Indiana Central Company, upon which the latter, in behalf of his company, had executed the bridge contract and the modification thereof, as well as the original lease and the amendment thereof, demanded payment directly from the. Pittsburgh Company, semi-annually, of the sums payable by the Indiana Central Company for tolls and deficiencies under the modified bridge contract; and for more than three years, from June, 1871, to September, 1874, the comptroller of the Pittsburgh Company, after examining the books of account of the Bridge Company, paid to the Bridge Company the amount both of such tolls and of such deficiencies. Since that time like payments were demanded by the Bridge Company of the Pittsburgh Company, and the tolls only were paid.

*Mr. George Hoadly* for appellants.

I. The lease and amended lease were *ultra vires* of both lessor and lessee.

(1) *As to the lessor.* The Columbus, Chicago and Indiana Central Railway Company was a corporation of Ohio, Indiana and Illinois. By repeated decisions of this court, it is settled that this made it a separate corporation of each of the States, *quoad* the franchises conferred by- and the property situate within such State. *Ohio & Mississippi Railroad Co.* v. *Wheeler,* 1 Black, 286; *Railway Co.* v. *Whitton,* 13 Wall. 270; *Muller* v. *Dows,* 94 U. S. 444, 447; *Kansas Pacific Railroad* v. *Atchison, Topeka &c. Railroad Co.,* 112 U. S. 414. In order, therefore, that it might lease its entire road, the power must have been conferred by all the States through which its line ran. Doubtless, it might lease that part of its road lying in

Ohio separately, if it had authority so to do under the laws of Ohio, and the same is true as to the portions of its line within the other States ; but to sustain a lease of its entire line, such as this was, the power must be shown to have been conferred by all these States. As that portion of the line situate within the State of Indiana, 424½ miles in length, separating the portions of the railroad lying in Ohio and Illinois from each other by the entire width of the State of Indiana, was necessarily an integral part thereof, it has been established by the decision of this court in the case of *Pennsylvania Railroad* v. *St. Louis, Alton & Terre Haute Railroad*, 118 U. S. 290, 630, that there was no law of Indiana at the time this lease was made, conferring on the lessor company power to make it.

(2) *As to the lessee.* The State of Ohio could not confer this power upon the Pittsburgh, Cincinnati and St. Louis Railway Company, because it was a power to be exercised with reference to property within the local jurisdiction and state sovereignty of Indiana alone.

This is a necessary result of the limitations of the powers of the several States within the boundaries of those States. The United States, not the States severally, have the right to pass laws which shall operate in more than one State. I do not deny that the State of Ohio has authorized the lease, by one railroad company to another, of a railroad, part of which may be outside of the State of Ohio; but, as the power of the State is *infra*-territorial, this legislation is not in itself alone sufficient.

II. Neither party to the lease had legal authority to enter into the bridge contract or either of the amendments thereto. This proposition is established by the decision in the case of *Pennsylvania Railroad Co.* v. *St. Louis, Alton &c. Railroad*, *ubi supra.*

Neither the Columbus, Chicago and Indiana Central railway nor the Pittsburgh, Cincinnati and St. Louis railway approaches within two hundred miles of the bridge, whose receipts were attempted to be guaranteed by the contracts in question.

Neither Ohio, Indiana nor Illinois have conferred the power

on any of the parties to this case to enter into the bridge contracts. The Indiana statutes were before this court in the case of the St. Louis, Alton and Terre Haute Railroad Company, and need no further reference. The form of the statute of Ohio, in force at the time the contract was made, will be found in 1 Swan & Critchfield, 281. It carefully limits the power to railroad companies whose lines of railroad connect or are continuous, and does not extend to bridge companies at all. *Pearce* v. *Madison and Indianapolis Railroad,* 21 How. 441. See also *Davis* v. *Old Colony Railroad,* 131 Mass. 258; *York and Maryland Line Railroad* v. *Winans,* 17 How. 30; *Green Bay and Minnesota Railroad* v. *Union Steamboat Co.,* 107 U. S. 98; *Eastern Counties Railway* v. *Hawkes,* 5 H. L. Cas. 331; *Ashbury Railway Carriage & Iron Co.* v. *Riche,* L. R. 7 H. L. 653; *McGregor* v. *Dover and Deal Railway,* 18 Q. B. 618; *East Anglian Railway Co.* v. *Eastern Counties Railway,* 11 C. B. 775; *Downing* v. *Mount Washington Road Co.,* 40 N. H. 230; *Pittsburgh & Steubenville Railroad* v. *Allegheny County,* 79 Penn. St. 210.

III. Neither lessor nor lessee authorized its officers to execute the bridge contract or either of the amendments thereto. This court in *Thomas* v. *Railroad Co.,* 101 U. S. 71, at p. 86, uses this language: "In regard to corporations, the rule has been well laid down by Comstock, C. J., in *Parish* v. *Wheeler,* 22 N. Y. 494, that the executed dealings of corporations must be allowed to stand for and against both parties when the plainest rules of good faith require it." It may be contended that this case is within this rule. To which we answer: (1), in the words of Mr. Justice Miller, following the passage just quoted: "But what is sought in the case before us is the enforcement of the unexecuted part of this agreement." (2) Had the bridge contract stood as originally executed, and without amendments, we should not be here complaining of an adverse decision in the Circuit Court; for that contract required the Columbus, Chicago and Indiana Company to pay only in proportion to its use of the bridge.

IV. The lease and amended lease, and with them all liability upon the bridge contracts, were determined by eviction,

January 1st, 1875. The view taken by the court in its opinion makes it unnecessary to elaborate the argument on this point.

*Mr. Lyman Trumbull* and *Mr. Melville W. Fuller* for appellee.

MR. JUSTICE GRAY, after stating the case as above reported, delivered the opinion of the court.

The principal positions taken in the argument for the appellants were, that the Indiana Central Company, the Pittsburgh Company and the Pennsylvania Company never authorized their officers to execute the bridge contract, or to bind them by it; and that the contract was beyond the scope of their corporate powers. But the court is of opinion that upon the facts of this case neither of these positions can be maintained.

When the president of a corporation executes, in its behalf, and within the scope of its charter, a contract which requires the concurrence of the board of directors, and the board, knowing that he has done so, does not dissent within a reasonable time, it will be presumed to have ratified his act. *Indianapolis Rolling Mill* v. *St. Louis &c. Railroad*, 120 U. S. 256. And when a contract is made by any agent of a corporation in its behalf, and for a purpose authorized by its charter, and the corporation receives the benefit of the contract, without objection, it may be presumed to have authorized or ratified the contract of its agent. *Bank of Columbia* v. *Patterson*, 7 Cranch, 299; *Bank of United States* v. *Dandridge*, 12 Wheat. 64; *Zabriskie* v. *Cleveland &c. Railroad*, 23 How. 381; *Gold Mining Co.* v. *National Bank*, 96 U. S. 640; *Pneumatic Gas Co.* v. *Berry*, 113 U. S. 322, 327. This doctrine was clearly and strongly stated by Mr. Justice Story, delivering the judgment of this court, in each of the first two of the cases just cited.

In *Bank of Columbia* v. *Patterson*, which was an action brought against a corporation by an administrator to recover for work done by his intestate under contracts with the committee of the corporation, he said: "Wherever a corporation

is acting within the scope of the legitimate purposes of its institution, all parol contracts, made by its authorized agents, are express promises of the corporation; and all duties imposed on them by law, and all benefits conferred at their request, raise implied promises, for the enforcement of which an action may well lie." 7 Cranch, 306. " Let us now consider what is the evidence in this case, from which the jury might legally infer an express or an implied promise of the corporation. The contracts were for the exclusive use and benefit of the corporation, and made by their agents for purposes authorized by their charter. The corporation proceed, on the faith of those contracts, to pay money from time to time to the plaintiff's intestate. Although, then, an action might have lain against the committee personally, upon their express contract, yet, as the whole benefit resulted to the corporation, it seems to the court that from this evidence the jury might legally infer that the corporation had adopted the contracts of the committee, and had voted to pay the whole sum which should become due under the contracts, and that the plaintiff's intestate had accepted their engagement." 7 Cranch, 307.

In *Bank of United States* v. *Dandridge,* the point decided was that the approval of a cashier's bond by the board of directors of a bank, as required by statute, need not appear upon the records of the board, but might be proved by presumptive evidence, in the same manner as similar facts might be proved in the case of private persons, not acting as a corporation or as the agents of a corporation. The general doctrine was affirmed, that the presumptions, which, by the general rules of evidence, "are continually made, in cases of private persons, of acts even of the most solemn nature, when those are the natural result or necessary accompaniment of other circumstances," are equally applicable to corporations; and it was said: " Persons, acting publicly as officers of the corporation, are to be presumed rightfully in office; acts done by the corporation, which presuppose the existence of other acts to make them legally operative, are presumptive proofs of the latter. Grants and proceedings beneficial to the corporation are presumed to be accepted; and slight acts on their

part, which can be reasonably accounted for only upon the supposition of such acceptance, are admitted as presumptions of the fact. If officers of the corporation openly exercise a power which presupposes a delegated authority for the purpose, and other corporate acts show that the corporation must have contemplated the legal existence of such authority, the acts of such officers will be deemed rightful, and the delegated authority will be presumed." 12 Wheat. 70.

The original bridge contract was executed by the president of the Indiana Central Company, in its behalf, upon the formal request of the presidents of the Pittsburgh and Pennsylvania Companies, undertaking that these two corporations should assume all the liabilities and obligations of that contract and be entitled to all its benefits. The board of directors of the Indiana Central Company, having been informed by its president that he had executed the contract, never dissented, and must therefore be presumed to have concurred. The modification of the bridge contract was executed by the president of that company, in its behalf, upon a similar request and undertaking of the presidents of the Pittsburgh and Pennsylvania Companies in their behalf.

After all this, the bridge was opened for use, and was used by the Pittsburgh and Pennsylvania Companies. For more than three years, semi-annual accounts for the sums payable by the Indiana Central Company were rendered directly by the Bridge Company to the Pittsburgh Company, and settled by the latter, after examination by its comptroller. It must be presumed, although not affirmatively proved, that the comptroller reported his action in this respect to the board of directors, as well as to the stockholders at their annual or other meetings. There is no difficulty, therefore, in holding that the Pittsburgh Company was bound by the bridge contract and the modification thereof, if within its corporate powers.

The evidence that the directors or stockholders of the Pennsylvania Company authorized or ratified the action of its president in this regard is not so full and conclusive, but is quite sufficient to bind this company. After the execution of

the original bridge contract, the directors of the Pennsylvania Company twice joined with the president in a printed annual report to the stockholders, declaring in unequivocal terms the settled policy of this company to secure a continuous line of traffic from Philadelphia to Keokuk and westward, and stating that this object had been accomplished through the Pittsburgh Company.

The reasonable inference from this evidence, which there is nothing in the record to control or qualify, is that the Pennsylvania Company had the benefit of the original bridge contract, and either authorized or ratified its execution; and, under the circumstances of this case, the president must be considered as having authority to procure and assent to the modification of that contract as to the proportion of the deficiency in tolls to be borne by the Pittsburgh Company as principal and the Pennsylvania Company as guarantor.

From all the facts of the case, the conclusion is inevitable that the Pittsburgh and the Pennsylvania Companies were the real, though not the formal, parties to the bridge contract executed by the Indiana Central Company at their request and for their benefit, and that this contract, as well as the lease, bound the Pittsburgh and Pennsylvania Companies, if within the scope of their corporate powers.

The outlines of the doctrine of *ultra vires*, and the reasons on which it rests, have been clearly stated in previous judgments of this court.

The reasons why a corporation is not liable upon a contract *ultra vires*, that is to say, beyond the powers conferred upon it by the legislature, and varying from the objects of its creation. as declared in the law of its organization, are: 1st. The interest of the public, that the corporation shall not transcend the powers granted. 2d. The interest of the stockholders, that the capital shall not be subjected to the risk of enterprises not contemplated by the charter, and therefore not authorized by the stockholders in subscribing for the stock. 3d. The obligation of every one, entering into a contract with a corporation, to take notice of the legal limits of its powers.

These three reasons are clearly brought out in the unani-

mous judgment of this court, delivered by Mr. Justice Camp- bell, in the leading case of *Pearce* v. *Madison & Indianapolis Railroad*, 21 How. 441, in which it was held that a railroad corporation was not liable to be sued upon promissory notes which it had given in payment for a steamboat received and used by it, and running in connection with its railroad.

So it has been repeatedly adjudged by this court that a lease made by one railroad corporation to another, either of which is not expressly authorized by law to enter into the lease, is *ultra vires* and void. *Thomas* v. *Railroad Co.*, 101 U. S. 71; *Pennsylvania Railroad* v. *St. Louis &c. Railroad*, 118 U. S. 290, 630; *Oregon Railway* v. *Oregonian Railway*, 130 U. S. 1.

But while the charter of a corporation, read in connection with the general laws applicable to it, is the measure of its powers, and a contract manifestly beyond those powers will not sustain an action against the corporation, yet whatever, under the charter and other general laws, reasonably con- strued, may fairly be regarded as incidental to the objects for which the corporation is created, is not to be taken as prohib- ited. Accordingly, where the charter of a railroad corpora- tion, or the general laws applicable to it, manifest the intention of the legislature, for the purpose of securing a continuous line of transportation of which its road forms part, to confer upon it the power of making contracts with other railroad or steam- boat corporations to promote that end, such contracts are not *ultra vires. Green Bay & Minnesota Railroad* v. *Union Steamboat Co.*, 107 U. S. 98. See also *Branch* v. *Jesup*, 106 U. S. 468, 478.

Whether, in view of the previous decisions of this court, the lease from the Indiana Central Company could be upheld it is unnecessary to consider, because the validity of the bridge contract does not appear to us to depend upon the validity or invalidity of the lease.

The bridge contract and the lease were separate and distinct agreements. The bridge contract was in form between the Bridge Company and the Indiana Central Company. The lease was between the Indiana Central Company and the Pittsburgh

and Pennsylvania Companies, and the Bridge Company was not a party to the lease.

The Bridge Company was organized under the laws of Iowa and Illinois, and was authorized by those laws and by the act of Congress of July 25, 1866, c. 246, § 7, (14 Stat. 245,) to construct and maintain the bridge; and its power to enter into the bridge contract is undoubted. The power of the Indiana Central Company, as an Illinois corporation, to enter into that contract is made equally clear by the statutes of Illinois, collected in the brief of the appellee.

By the statute of February 28, 1854, all railroad companies of Illinois, having their termini fixed by law, and their roads intersecting by continuous lines, are authorized to consolidate their property and stock with each other, or with companies out of the state, whose lines connect with theirs; and when, by reason of such consolidation, or of such extension into or through an adjoining state, it is necessary for the construction of any railroad to cross any stream of water, it may be done by bridges or viaducts. By the statute of February 12, 1855, all railroad corporations of Illinois have the power to make all necessary and convenient " contracts and arrangements with each other, and with railroad corporations of other states, for leasing or running their roads, or any part thereof;" as well as the " right of connecting with each other and with the railroads of other states, on such terms as shall be mutually agreed upon by the companies interested." By the statute of February 16, 1865, " it shall be lawful for the directors of any railroad company created by the laws of this state to contract for the use and operation of any railroad connecting with their line beyond the limits of the state; and in all contracts for the use and operation of any railroad by another corporation, it shall be lawful for the parties to provide for the use of any of the powers and privileges of either or both of the corporations parties thereto." And by the statute of February 25, 1867, "railroads terminating or to terminate at any point, on any line of continuous railroad thoroughfare, where there now is or shall be a railroad bridge for crossing of passengers and freight in cars over the same as part of such thoroughfare,

shall make convenient connections of such railroads, by rail, with the rail of such bridge; and such bridge shall permit and cause such connections of the rail of the same with the rail of such railroads, so that by reason of such railroads and bridge there shall be uninterrupted communication over such railroads and bridge as public thoroughfares." See also Stats. of February 12, 1853, March 5, 1867, and March 11, 1869. Gross's Stats. (3d ed.) 536–539.

The bridge contract was therefore a lawful and valid contract as between the Bridge Company and the Indiana Central Company. Upon the question of its effect to bind the Pittsburgh and Pennsylvania Companies, some other facts attending its execution are worthy of consideration.

The bridge contract was not in existence as an executed and binding contract when the lease was made. But it was signed after the execution of the lease and the delivery of possession of the road by the Indiana Central Company to the Pittsburgh Company, and at the formal request of the Pittsburgh and Pennsylvania Companies, embodying an express agreement on their part with the Indiana Central Company to " assume all the liabilities and obligations, and be entitled to all the benefits of said bridge contract." The reference in that request and agreement to the ninth article of the lease was for the purpose of defining the extent of the liabilities and benefits assumed, and perhaps of indicating that the Pittsburgh Company alone was bound as principal, and the Pennsylvania Company as guarantor only; but it did not make the bridge contract a part of the lease.

The reasonable inference is that, according to the original intent and by the subsequent action of the parties, the Pittsburgh and Pennsylvania Companies were understood and treated as directly liable to the Bridge Company for the proportion of tolls and deficiencies, which, by the terms of the bridge contract, was chargeable to the Indiana Central Company.

By the laws of Illinois, as we have seen, the bridge contract was valid, and might lawfully be made between the Bridge Company and the Indiana Central Company; and it appears

to us equally clear that the laws of Pennsylvania authorized the Pittsburgh and Pennsylvania Companies to assume the obligation of that contract with the Bridge Company, either directly or through the intervention of the Indiana Central Company.

By the statute of Pennsylvania of April 23, 1861, it is enacted that "It shall and may be lawful for any railroad company, created by and existing under the laws of this commonwealth, from time to time to purchase and hold the stock and bonds, or either, of any other railroad company or companies chartered by, or of which the road or roads is or are authorized to extend into, this commonwealth ; and it shall be lawful for any railroad companies to enter into contracts for the use or lease of any other railroads upon such terms as may be agreed upon with the company or companies owning the same, and to run, use and operate such road or roads in accordance with such contract or lease: Provided, that the roads of the companies so contracting or leasing shall be, directly or by means of intervening railroads, connected with each other." Purdon's Digest (11th ed.) 1439.

While the first provision of that statute authorizes any railroad company of Pennsylvania to purchase and hold stock and bonds of such railroad companies as either are chartered by the State or have roads extending into it, the second clause makes it lawful for railroad companies of Pennsylvania to contract for the use or lease, not merely of railroads of the two classes defined in the first clause, but of any railroads whatever, provided only " the roads of the companies so contracting or leasing shall be, directly or by means of intervening railroads, connected with each other." The only reasonable construction of the words " any other railroads," in the second clause, is that it includes all railroads, whether within or without the State, coming within the description of the proviso.

But any question of the construction of that statute in this regard is removed, or rendered immaterial, by the statute of Pennsylvania of February 17, 1870, (passed more than a year before the modified bridge contract was executed, or the bridge completed or used,) which, in the clearest terms, authorizes

any railroad company of Pennsylvania to enter into a lease or any other contract on such terms and conditions as may be agreed upon, or to guarantee the payments or covenants thereof, as to any railroads, whether " within the limits of this state, or created by or existing under the laws of any other state or states," provided they are connected, either directly or by means of intervening lines, with its road, and form a continuous route for the transportation of persons and property. Purdon's Digest (11th ed.) 1441.

Nor can we have any doubt that the Bridge Company was a railroad company, and the bridge a railroad, within the meaning of these statutes. The principal purpose and use of the bridge was the passage of railroad trains. It was, in substance and effect, a railroad built over water, instead of upon land; and, strictly speaking, it was a railway viaduct rather than a bridge. *Bridge Proprietors* v. *Hoboken Co.,* 1 Wall. 116.

The necessary conclusion from the foregoing considerations is that it was rightly held by the Circuit Court that the Bridge Company was entitled to recover from the Pittsburgh Company, and it having declined to pay upon due demand, to recover from the Pennsylvania Company also, the amount of the deficiencies in tolls which, by the modified bridge contract, was payable by the Indiana Central Company.

It is proper to add that our judgment does not rest in any degree upon the ground suggested in argument, that the bridge contract and the lease having been executed, the Pittsburgh and Pennsylvania Companies, having received the benefits of them, are estopped to deny their validity; because, according to many recent opinions of this court, a contract made by a corporation, which is unlawful and void because beyond the scope of its corporate powers, does not, by being carried into execution, become lawful and valid, but the proper remedy of the party aggrieved is by disaffirming the contract, and suing to recover, as on a *quantum meruit,* the value of what the defendant has actually received the benefit of. *Louisiana* v. *Wood,* 102 U. S. 294; *Parkersburg* v. *Brown,* 106 U. S. 487, 503; *Chapman* v. *Douglas County,* 107 U. S. 348, 360; *Salt*

*Lake City* v. *Hollister*, 118 U. S. 256, 263; *Pennsylvania Railroad* v. *St. Louis &c. Railroad*, 118 U. S. 290, 317, 318.

The sole ground of our decision is that the bridge contract is independent of the lease, and is valid and binding as between the parties to this suit, whether the lease is valid or invalid. This being so, the question argued at the bar, whether the appellants, by reason of eviction, are no longer liable on the lease, becomes immaterial; and the judgment of the Circuit Court in a former suit, affirming the validity of the lease, has no effect upon our decision, for the same reason, as well as because the Bridge Company was not a party to that judgment, and therefore neither bound by it nor entitled to the benefit of it.

*Decree affirmed.*

Mr. Chief Justice Fuller and the late Mr. Justice Matthews, having been of counsel, took no part in the consideration or decision of this case.