**CRANE CO. v. JAMES McHUGH SONS, Inc., et al.**

No. 1819.

Circuit Court of Appeals, Tenth Circuit.

Nov. 6, 1939.

---

LEWIS, Circuit Judge, dissenting.

John H. Shirk, G. A. Paul, Charles E. Earnheart, George Shirk, and Sam Neff, all of Oklahoma City, Okl., for appellant.

Streeter B. Flynn, Robert M. Rainey, Lynn J. Bullis, Jr., Calvin Jones, and Rainey, Flynn, Green & Anderson, all of Oklahoma City, Okl., for appellees.

Before LEWIS, PHILLIPS, and BRATTON, Circuit Judges.

PHILLIPS, Circuit Judge.

James McHugh Sons, Inc.,[1] entered into a contract with the United States for the construction of eighteen apartments at Fort Sill, Oklahoma, for $612,000.

On January 8, 1934, McHugh, as principal, and the New Amsterdam Casualty Company, Hartford Accident and Indemnity Company, The Fidelity and Casualty Company of New York, and the United States Fidelity and Guaranty Company,[2] as sureties, executed a bond to the United States conditioned for the faithful performance of the contract and the prompt payment to all persons supplying labor and material in the prosecution of the work provided for in the contract.

H. W. Thompson, doing business as H. W. Thompson Heating & Engineering Company,[3] submitted a bid to McHugh for furnishing all materials and performing all labor in the installation of the plumbing, gas, and heating equipment in the apartments for the sum of $94,000.[4] McHugh advised Thompson that the bid would be accepted if he could furnish a proper surety bond.

Crane Company[5] had its principal office at Chicago, Illinois, and maintained a branch office at Oklahoma City, Oklahoma. It had a copy of the plans and had suggested to Thompson that he submit a bid, had quoted him prices, and assisted him in preparing and submitting his bid. Thompson experienced difficulty in securing the bond and took the matter up with Legg, manager of the branch office of Crane at Oklahoma City. Thompson advised Legg that he could secure the bond if Crane would furnish the materials and look to Thompson alone for payment therefor. Legg suggest-

ed to Thompson that they go to Chicago and take the matter up with Crane's head office in that city. Whereupon, Legg and Thompson went to Chicago. They conferred with various surety companies and Legg conferred with the officers of Crane. Thereafter, the Guaranty Company agreed to write the bond on condition that Crane waive any claim under the bond for materials furnished to Thompson. On December 7, 1933, Legg, purporting to act as the agent of Crane, executed the waiver to the Guaranty Company. Thereafter, the Guaranty Company executed Thompson's bond in the principal sum of $97,700, the bid in the meantime having been increased to that amount by a supplemental bid.

The subcontract was entered into between McHugh and Thompson. Under it McHugh was to pay Thompson on or about the fifteenth of each month, 90 per cent of the value of the work completed during the preceding month as estimated and approved by the constructing quartermaster, and the remaining 10 per cent upon final completion and acceptance of the work by the constructing quartermaster, such payments to be made only upon presentation of formal waivers of liens, together with an affidavit that all payments had been made for all labor and materials. The subcontract expressly provided that McHugh had the right to retain at any time out of moneys due Thompson a sum sufficient to pay all persons who had performed labor or furnished materials for work included in the contract and that such sums might be retained until satisfactory evidence was furnished to McHugh that all such claims had been fully satisfied.

Thompson entered into the performance of the subcontract. On February 24, 1934, McHugh wrote a letter to Thompson reading in part as follows:

"We are enclosing our check No. 7293 in the amount of $10,630.00 as a payment on your January estimate. * * * We were compelled to withhold your payment until we received your waiver from the Oklahoma Office of Crane Company.

"The release of Crane Company dated February 15 does not meet with our approval, as the form used is a waiver of lien used on private enterprises, * * * It is our request, therefore, that you again

---

[1] Hereinafter referred to as McHugh.
[2] Hereinafter referred to as the Guaranty Company.
[3] Hereinafter referred to as Thompson.

[4] The bid was later increased to $97,700.
[5] Hereinafter referred to as Crane.

contact the Crane Company office and have them prepare a release as follows:

"We, the Crane Company of 705 West Main Street, Oklahoma City, Oklahoma, will hold the H. W. Thompson Heating & Engineering Company of Stillwater, Oklahoma, duly responsible for the payment of all plumbing and heating material furnished on the 18 Four Family Apartments now being erected at Fort Sill Oklahoma. Further, in the event the H. W. Thompson Heating & Engineering Company default in the payment of their account to us, we will not hold James McHugh Sons, Inc., General Contractors, of 6449 South Park Avenue, Chicago, Ill., responsible for the payment of our account. This release embodies all the materials to be furnished by us in connection with this contract.

"The above form of release must be signed by a duly authorized representative of the Crane Company * * * Would request you to send us this release at the earliest possible date, obliging * * *"

On March 1, 1934, Legg prepared a release in the exact language of that requested by McHugh in its letter of February 24, 1934, signed it "Crane Co., by C. L. Legg, Manager," and forwarded it to McHugh at its Chicago office.

McHugh mailed a copy of its letter of February 24, 1934, to Crane at its Chicago office and on receipt of the release of March 1, 1934, executed by Legg, forwarded a letter to Crane at its Chicago office enclosing a copy of such release. Crane did not advise McHugh that Legg was unauthorized to execute the release, or otherwise object thereto until it filed its petition of intervention in the instant case.

Thompson completed the performance of the sub-contract. McHugh paid him the amount due on the monthly estimates and the final estimate in reliance upon the release of March 1, 1934, and out of such funds Thompson made monthly payments to Crane for materials furnished, during the months of February and September, 1934, inclusive, aggregating $45,130.47.

The United States on relation of J. B. Klein Iron & Foundry Company brought this suit against McHugh and its sureties on the bond of January 8, 1934. Crane filed an intervening petition therein, asserted a balance due from Thompson of $28,697.06, and sought recovery thereof

from McHugh, Thompson, and the sureties on the bond of January 8, 1934. McHugh and the sureties pleaded the release of March 1, 1934. Thompson denied any indebtedness to Crane and asserted that he and Crane were coadventurers in the carrying out of the sub-contract.

The trial court held that the letter of March 1, 1934, released McHugh from any liability to Crane for materials furnished and discharged McHugh's sureties and entered judgment on the intervening petition in favor of McHugh and its sureties. Crane has appealed.

■■ Crane asserts that Legg was without authority to execute the waiver to the Guaranty Company. Crane here seeks recovery upon the bond given by McHugh and its sureties and not upon the bond given by Thompson and the Guaranty Company. Whether Legg had authority to sign the waiver to the Guaranty Company is not here material. However, Legg had been connected with Crane for 35 years and for 18 years had been employed at its Oklahoma City branch. After the Guaranty Company demanded the waiver as a condition to writing the bond, Legg went to the office of C. R. Crane, vice president of Crane, for the purpose of taking up the matter of executing the waiver. When he came out of Mr. Crane's office Legg said to Thompson, "We got everything all fixed." Thereupon, he went to the office of the Guaranty Company and executed the waiver. Under all the circumstances, it is a fair inference that he was authorized so to do. But, as stated above, whether he was so authorized is not here material. The fact of the execution of the waiver is material only in that it explains why McHugh demanded a release from Crane before making payments to Thompson.

■ Crane asserts that Legg was without authority to execute the release of March 1, 1934. Legg was manager of the Oklahoma City branch. His duties embraced the ordering of merchandise, its sale, the collection of accounts, the care and upkeep of the real and personal property at the branch, and the conservation of Crane's assets of whatever nature under his control. The first release from Crane referred to in McHugh's letter to Thompson of February 24, 1934, was on a mimeographed standard form, a supply of which Crane kept at its Oklahoma City branch office. The fact that these blank releases were kept at that office clearly indicates that

some person there was authorized to execute a release and it is a fair assumption such authority was lodged in Legg as manager of the branch office. We are of the opinion that Legg acted within his apparent authority in executing the release.[6]

Furthermore, any lack of authority on the part of Legg in the first instance to execute the release of March 1, 1934, was ratified by Crane. Copy of the letter demanding the release and a copy of the release after it was executed by Legg were promptly mailed by McHugh to Crane at its Chicago office. Crane did not advise McHugh that Legg was unauthorized to execute the release or otherwise object thereto until it filed its petition of intervention herein.

Silence under circumstances when, according to the ordinary experience and habits of men, one would naturally speak if he did not consent, is evidence from which assent may be inferred.[7]

One who, with knowledge of the material facts concerning an act done by one assuming to act as his agent without authority, voluntarily accepts the benefits flowing therefrom, thereby ratifies the act and makes it his own as though he had authorized it from the beginning.[8]

Knowledge requisite to ratification need not embrace every detail of the transaction. It is sufficient if the purported principal has knowledge of all the material facts.[9]

Here, McHugh, because of the waiver executed by Legg to the Guaranty Company, was without protection under Thompson's bond for materials furnished by Crane. In order to protect itself, it was necessary for McHugh to have a release from Crane, or require Thompson to furnish evidence of full payment to Crane for materials furnished before making payments to Thompson. It had a right under the subcontract to demand such evidence. To facilitate payments to Thompson, and in turn to Crane, it requested the release. Crane's Chicago office was promptly notified by McHugh of the execution of the release by Legg. On the faith of the release, McHugh made payments to Thompson, out of which Thompson in turn made substantial payments to Crane. From the time the release was executed until the contract had been completed and all the payments had been made, Crane remained silent. Under the circumstances, its silence is evidence from which its assent to the action of Legg in executing the release may be inferred.

Crane contends that the release of March 1, 1934, was without consideration. A detriment incurred by the promisee or a benefit received by the promisor at the request of the promisor is a sufficient consideration to support a promise.[10] If there is a detriment to the promisee, there need not be a benefit to the promisor. The consideration may move to a third person, as for example, forbearance to exercise a right against a third person at the request of the promisor.[11]

[6] See Braniff v. McPherren, 177 Okl. 292, 58 P.2d 871; Weil-McLain Co. v. Maryland Casualty Co., 217 Wis. 126, 258 N.W. 175.

[7] Wolfe v. Texas Company, 10 Cir., 83 F.2d 425, 430, 431; Ellis v. Simmons, 5 Cir., 11 F.2d 596, 597; Philadelphia, W. & B. R. Co. v. Cowell, 28 Pa. 329, 70 Am.Dec. 128; Heyn v. O'Hagen, 60 Mich. 150, 26 N.W. 861, 863; Renland v. First Nat. Bank of Grass Range, 90 Mont. 424, 4 P.2d 488; Ankeny v. Young Bros., 52 Wash. 235, 100 P. 736, 738, 739; Restatement of the Law of Agency, § 94; Mechem on Agency, 2d Ed., Vol. 1, § 453; O.S.1931, § 9434, 15 Okl. St.Ann. § 75.

[8] Wolfe v. Texas Company, supra; Whitcomb v. Oller, 41 Okl. 331, 137 P. 709, 710; Chicago, R. I. & P. Ry. Co. v. Newburn, 39 Okl. 704, 136 P. 174, 176; United States F. & G. Co. v. Shirk, 20 Okl. 576, 95 P. 218, 220; Pittsburgh, C. & St. L. R. Co. v. Keokuk & H. Bridge Co., 131 U.S. 371, 381, 9 S.Ct. 770, 33 L.Ed. 157.

[9] Wolfe v. Texas Company, supra; Amazon Fire Ins. Co. v. Bond, 65 Okl. 224, 165 P. 414, 418; Thorp Oil & Specialty Co. v. Home Oil Refg. Co., 79 Okl. 225, 192 P. 573, 574; Guaranty Trust Co. of N. Y. v. Koehler, 8 Cir., 195 F. 669, 682; Bloomfield v. Charter Oak Bank, 121 U.S. 121, 135, 7 S.Ct. 865, 30 L.Ed. 923; Owings v. Hull, 9 Pet. 607, 629, 9 L.Ed. 246; Mechem on Agency, 2d Ed., Vol. 1, § 395.

[10] Williston on Contracts, Rev.Ed., Vol. 1, § 102; Petroleum Refractionating Corp. v. Kendrick Oil Company, 10 Cir., 65 F.2d 997; Kemp v. National Bank of Republic, 4 Cir., 109 F. 48, 52; Eastman Land & Inv. Co. v. Long-Bell Lumber Co., 30 Okl. 555, 120 P. 276; Riddle v. Hudson, 68 Okl. 172, 172 P. 921.

[11] Williston on Contracts, Rev.Ed., Vol. 1, § 113; Restatement of the Law of Contracts, § 75(2); Riddle v. Hudson,

■ Under the subcontract McHugh had the legal right to withhold payments until Thompson furnished formal waivers of liens, together with an affidavit that all payments for labor and material had been made, and to retain out of the moneys at any time due to Thompson, a sum sufficient to pay the persons who had performed labor or furnished materials in the carrying out of the subcontract. On furnishing of the release, McHugh waived these legal rights and made payments to Thompson without insisting upon them. This clearly was a detriment to McHugh for the benefit of Thompson, a third person. Furthermore, out of the moneys paid by McHugh to Thompson, $45,-130.47 was paid over by Thompson to Crane. These payments were made in reliance on the release and constituted a benefit to Crane. It follows that the release was supported by a sufficient consideration. See Pittsburgh Plate Glass Co. v. Art Centre Apartments, Inc., 253 Mich. 501, 235 N.W. 234, 235; Home Supply Co., Inc. v. Ostrom, 164 Minn. 99, 204 N.W. 647.

■■ Counsel for Crane assert that the release was lacking in requisite certainty, and is indefinite and equivocal. We see no force to this contention. It is a primary rule in the construction of releases that the intention of the parties must govern. That intention is to be arrived at by the rules which govern in the construction of other contracts.[12] By the bond of January 8, 1934, McHugh was expressly bound to make payment promptly to all persons supplying materials in the prosecution of the work. The release of March 1, 1934, expressly stated that Crane would hold Thompson responsible for the payment of all materials furnished by it under the contract, and that Crane would not hold McHugh responsible for the payment therefor. This, we think,

clearly and unmistakably manifested an intention to look solely to Thompson for payment for the materials and to release McHugh of any liability under the bond.

Section 9630, O.S.1931, 15 Okl.St.Ann. § 377, in part reads as follows:

"A surety is exonerated:

"First. In like manner with a guarantor.

"Second. To the extent to which he is prejudiced by any act of the creditor which would naturally prove injurious to the remedies of the surety or inconsistent with his rights, or which lessens his security; * * * ."

Section 9617, O.S.1931, 15 Okl.St.Ann. § 338, in part reads as follows:

"A guarantor is exonerated, except so far as he may be indemnified by the principal, if by any act of the creditor, without the consent of the guarantor, the original obligation of the principal is altered in any respect, or the remedies or rights of the creditor against the principal, in respect thereto, in any way impaired or suspended."

■■ The burden was on the surety companies to prove the release of McHugh. They met that burden. While two jurisdictions hold to the contrary,[13] the great weight of authority is that the burden of showing assent to the release on the part of the surety companies was on Crane.[14] That the release of McHugh by Crane resulted in injury to the surety companies cannot be doubted. James McHugh testified that but for the release, payments would not have been made to Thompson without a showing by him that the materials furnished by Crane had been paid for. Furthermore, but for the release, on payment of Crane's claim the surety companies would be subrogated to Crane's claim against McHugh.[15]

supra; People's State Bank v. Smith, 120 Neb. 29, 231 N.W. 141, 143; Exum v. Lynch, 188 N.C. 392, 125 S.E. 15, 17, 18; Cardoza v. Pereira, 53 R.I. 460, 167 A. 532; Mack v. Mack, 87 Neb. 819, 128 N.W. 527, 528, 31 L.R.A.,N.S., 441; Faulkner v. Gilbert, 57 Neb. 544, 77 N.W. 1072.

[12] In re Atwater, 2 Cir., 266 F. 278, 281; In re Russell, 2 Cir., 176 F. 253, 257; Black v. Martin, 88 Mont. 256, 292 P. 577, 581; Adams Express Co. v. Beckwith, 100 Ohio.St. 348, 126 N.E. 300, 302; O.S.1931, §§ 9459, 9460, 9461, 9462, 9463, 9467, 15 Okl.St.Ann. §§ 151–155, 159.

[13] See Guderian v. Leland, 61 Minn. 67,

63 N.W. 175; Washington Slate Co. v. Burdick, 60 Minn. 270, 62 N.W. 285; State v. Mannig, 55 Mo. 142.

[14] Van Hoesen v. Gelfen, 103 N.J.Eq. 234, 143 A. 137, 139, affirmed 110 N.J. Eq. 69, 158 A. 343; Alexander v. Bosworth, 26 Cal.App. 589, 147 P. 607, 608; Tuohy v. Woods, 122 Cal. 665, 55 P. 683, 684; Stowell v. Goodenow, 31 Me. 538, 540; Hamilton v. Republic Casualty Co., 102 W.Va. 32, 135 S.E. 259, 262; Hanks v. Gerbracht, 75 Hun 181, 26 N.Y.S. 1097, 1098, 1099. See, also, Yount v. Bank of Commerce, 172 Okl. 65, 44 P.2d 874; Everett v. United States, 6 Port.,Ala., 166, 30 Am.Dec. 584.

[15] See Wisconsin Electric Sales Co. v.

It follows that both McHugh and the surety companies were discharged from liability to Crane.

The judgment is affirmed.

LEWIS, Circuit Judge (dissenting).

James McHugh Sons, Inc., a corporation under the laws of Illinois, with offices and principal place of business at Chicago, entered into a contract with the United States to furnish all labor and materials and construct for a total consideration of $612,000 eighteen four-family apartment buildings at Fort Sill, Oklahoma. McHugh gave bond for the faithful performance of its contract as required by Section 270, Title 40, U.S. C.A. It, of course, was the principal named in the bond and signed as such. The sureties were New Amsterdam Casualty Company, a New York corporation; Hartford Accident and Indemnity Company, a Connecticut corporation; The Fidelity and Casualty Company of New York, organized under the laws of that state; and United States Fidelity and Guaranty Company, a Maryland corporation. $306,000 was named as the maximum penal sum for which the principal and its sureties were liable in event of breach; but the liability of New Amsterdam Casualty Company was limited to $123,000 of said penal sum and no more, and the liability of each of the other three sureties was limited to $61,000 of said penal sum and no more. The condition of liability and payment is this:

"The Condition of this Obligation is Such, that whereas the principal entered into a certain contract hereto attached, with the Government, dated December 1st, 1933, for furnishing all labor and materials, and performing all work required for the construction and completion of eighteen (18) Four-Family Apartments at Fort Sill, Oklahoma, all as more specifically set forth in the said Contract.

"Now Therefore, If the principal shall well and truly perform and fulfill all the undertakings, covenants, terms, conditions, and agreements of said contract and * * shall promptly make payment to all persons supplying the principal with labor and materials in the prosecution of the work provided for in said contract, * * * then this obligation to be void; otherwise to remain in full force and virtue."

The bond states the date of its execution as January 8, 1934. The work was completed in November, 1934, and final settlement was made between the United States and McHugh in December, 1934.

The J. B. Klein Iron and Foundry Co., a corporation, brought suit on the bond for its breach against the contractor James McHugh Sons, Inc., its four sureties on the bond, and H. W. Thompson, sole trader under the name of H. W. Thompson Heating and Engineering Co., defendants.

Crane Company, a corporation with its principal office at Chicago, intervened in that suit and by its petition disclosed that it had furnished materials to H. W. Thompson, who, as subcontractor of James McHugh Sons, Inc., had incorporated them in the buildings. Thompson as subcontractor had agreed with McHugh, the principal contractor, to furnish all labor and material and perform all work required for the installation of plumbing and heating called for in the principal contract for which, as intervenor alleged, it had not been fully paid, so it asked judgment for a claimed balance of $28,697.06 which was reduced by the court to $24,197.06 and later by stipulation to $18,399.26. The petition in intervention was on the general contractor's bond. It asserted no other basis for its claim.

James McHugh Sons, Inc., and its four surety companies joined in their answer to Crane's petition in intervention. The answer alleged that on March 1, 1934, intervenor executed and delivered to James McHugh Sons, Inc., this letter:

"Crane Company, 705 West Main Street,
 Oklahoma City, Oklahoma.
 "March 1, 1934.
"James McHugh Sons, Inc., 6449 South
 Park Avenue, Chicago, Ill.

"Gentlemen: We, Crane Co., of 705 West Main Street, Oklahoma City, Oklahoma, will hold the H. W. Thompson Heating and Engineering Company of Stillwater, Oklahoma, duly responsible for the payment of all plumbing and heating material furnished on the Eighteen (18) Four Family Apartments now being erected at Fort Sill, Oklahoma.

"Further, in the event the H. W. Thompson Heating & Engineering Company default in the payment of their account to us, we will not hold James Mc-

---

Fidelity & Deposit Co., 191 Wis. 645, 211 N.W. 670, 672; Weil-McLain Co. v.

Maryland Casualty Co., 217 Wis. 126, 258 N.W. 175, 177.

Hugh Sons, Inc., General Contractors of 6449 South Park Avenue, Chicago, Ill., responsible for the payment of our account.

"This release embodies all the materials to be furnished by us in connection with this contract.

"Crane Co.
"By C. L. Legg,
Manager.

"CLL:AS-1

"The above subscribed and sworn to before me this the First day of March, 1934. Alliene Singletary, Notary Public. My commission expires January 23, 1936."

It is my view that this letter had no relevancy to the bond given by James McHugh Sons, Inc., and the four surety companies, that there was no intention on the part of anyone interested in the matter to affect the rights or liabilities of anyone on that bond, but the letter of March 1, 1934, was intended as applicable only to a situation involved in the giving of another bond. The answer also pleads as a release of McHugh and the four surety companies a letter of December 7, 1933, said letter signed "Crane Co., By C. L. Legg, Mgr., Oklahoma City Branch" and addressed only to the United States Fidelity and Guaranty Company of Baltimore. It undoubtedly made no reference to McHugh's bond of January 8, 1934. That bond was not given until one month after the letter of March 7, 1933.

James McHugh Sons, Inc., in its contract with the United States dated December 1, 1933, was bound to furnish all the labor and materials and perform all the work required for the construction and completion of the eighteen apartments at Fort Sill in accordance with its bid of November 18, 1933, in strict accordance with the specifications, schedules and drawings for which it was to receive $612,000. Work was to be commenced December 10, 1933, and completed September 25, 1934. By contract of date December 7, 1933, James McHugh Sons, Inc., let to H. W. Thompson as subcontractor all plumbing, heating and gas fitting, the furnishing of all labor and material therefor, and fully complete that part of the work as required by the plans and specifications furnished by the War Department. They agreed that the part of the work to be done and the material to be furnished would be according to the terms and provisions of the contract between McHugh and the United States for which the subcontractor was to receive $97,700; that on or about the fifteenth day of each month payments would be made by the quartermaster to the contractor in the amount of 90% of the value of the work completed the preceding month as estimated and approved by the constructing quartermaster, the remaining 10% should be paid upon the final completion and acceptance by the quartermaster of the work to be done "and said payments to be made only upon presentation of final waivers of liens together with an affidavit that all payments have been made for all labor and material." It was agreed that the contractor might retain out of any money at any time due the subcontractor a sum sufficient to pay all persons who have performed labor or furnished material for the work included in the subcontract to protect the contractor against loss in the event the subcontractor shall default or fail to perform the contract or any part thereof, "and said sums may be retained by the contractor until satisfactory evidence is furnished the contractor that all such claims have been satisfied." The subcontractor was required at his own expense to procure compensation and indemnity accident insurance in a reliable company or companies satisfactory to the contractor covering full compensation to any employes for injury or death under the Workmen's Compensation Act of the state in which the work was being done in protection of the owner and contractor in case of accident to men employed on the building, themselves, other employes, or the public, and to furnish the contractor a certificate from the insurance company showing coverage in limits satisfactory to the contractor. He was also required to procure at his expense public liability insurance to indemnify the contractor from claims, suits or damages arising from accidents. Paragraph 6 of the contract is this:

"6. That, as a guarantee of the faithful performance of his part of the contract, the Sub-contractor agrees to furnish a corporate surety bond in a company satisfactory to the Contractor in the amount of Ninety-seven Thousand Seven Hundred Dollars ($97,700.00), premiums on said bond to be paid by the Sub-contractor herein."

The subcontract after it was prepared was at the office of James McHugh Sons in Chicago. It was waiting signature by the subcontractor. There was some delay in procuring a surety to sign with him as required by said paragraph 6. He applied

to the United States Fidelity and Guaranty Company of Baltimore at its office in Oklahoma City, and the agent there declined the risk, the exact reason therefor not being stated further than that it was a big job for Thompson counting his past experience or financial standing. Thereupon Thompson at the suggestion of C. L. Legg, who had charge of Crane Company's branch office as local manager, went to Chicago with Legg in the latter's automobile for the purpose of seeking a surety there. They met Mr. Polakoff, a Chicago sales agent for Crane Company. The three went to the offices of both James McHugh Sons, Inc., and Crane Company before they started to call on surety companies. Several such companies refused to become surety on the bond to be given by Thompson. Their last call was at the office of the United States Fidelity and Guaranty Company of Baltimore. They met Mr. Schilling, agent of that company, who testified he was responsible for all underwriting of the company's office at Chicago and transacted such other matters as pertained to the company's business throughout the United States that was referred to him. Mr. Schilling had just received a letter from the agent of his company at Oklahoma City about the matter. Schilling had not previously met any of the three gentlemen who called, Legg, Polakoff or Thompson. He first suggested an agreement of indemnity whereby Crane Company was to save harmless his company in consideration of its writing the bond. That was declined by Polakoff and Legg, who spoke for Crane Company. He then proposed that Crane Company give its letter to his company stating that the former would furnish all material needed by the subcontractor and would not look to the bond for payment. While they were there Mr. Schilling conversed over the long distance telephone with his company at Baltimore about the matter. Polakoff and Legg felt certain that the Crane Company would give such a letter. Mr. Schilling then called a stenographer and dictated the letter marked exhibit C in the record. It reads thus:

"Chicago, Ill., December 7, 1933.
"United States Fidelity and Guaranty Co.,
 Baltimore, Maryland.

"Gentlemen: In consideration of your becoming surety on the bond of H. W. Thompson as H. W. Thompson Heating and Engineering Company, of Stillwater, Oklahoma, in the amount of $97,700.00 in favor of James McHugh and Son, of Chicago, said bond covering the faithful performance on the part of H. W. Thompson as H. W. Thompson Heating and Engineering Company of its contract, dated December 7th, 1933, with James McHugh and Son for furnishing all labor and material and performing all work required for the installation of plumbing and heating on the contract at Fort Sill, Oklahoma, for the construction of Eighteen Four-Family Apartments, we hereby agree to furnish all material required on this contract until the contract is completed and accepted and not look to your bond for payment for said material, provided further that we agree not to take over 90% of monies due us until contract is completed and accepted by James McHugh and Son.

"Yours very truly,
 "Crane Co.,
 "By C. L. Legg,
 "Mgr. Oklahoma City Branch."

It was handed to Mr. Legg. He signed for Crane Company and handed it back to Mr. Schilling. A copy of it was given Mr. Legg. The three men left Mr. Schilling and went to the office of James McHugh Sons, Inc., where Thompson signed the subcontract, and he and Legg at once left Chicago for Oklahoma City. The United States Fidelity and Guaranty Company signed the subcontractor's bond on December 17, 1933.

During all the negotiations to procure a surety bond for Thompson as subcontractor nothing was said about the contract and bond between the United States and James McHugh Sons, Inc. Indeed, that bond was not given until a month later, January 8, 1934. When it was given the United States Fidelity and Guaranty Company of Baltimore became one of the four sureties for McHugh.

The trial court made these findings:

"Prior to the execution of the contract Thompson had submitted a bid to James McHugh Sons, Inc., and was advised by the general contractor, soon after submitting the bid, that if he could make proper bond the contract would be awarded to him.

"Thompson, in company with C. L. Legg, the Oklahoma City representative of Crane Company, proceeded to the City of Chicago, and after consultation with the officers of Crane Company and the Chicago representatives of the United States Fidelity and Guaranty Company, the surety

company agreed to execute the bond for Thompson upon the waiver of the Crane Company as to its account for material to be furnished. The waiver was delivered to the surety company in words and figures as follows."

Then follows a copy of exhibit C supra. The trial court proceeded:

"After the execution of this waiver, the United States Fidelity and Guaranty Company executed Thompson's bond, and the contract was awarded to Thompson.

"When the first estimate in favor of Thompson was due, the general contractor, *having knowledge that Crane Company had delivered the waiver to the United States Fidelity and Guaranty Company,* required of Thompson a release from the Crane Company, and on February 24, 1934, transmitted its check for $10,630.00 to Thompson in a letter in words and figures as follows:
"February 24, 1934.
"Re: 18 Four Family Apts., Fort Sill, Oklahoma. .
"H. W. Thompson Heating & Engineering Company, Stillwater, Oklahoma.

"Gentlemen: We are enclosing our check #7293 in the amount of $10,630.00 as a payment on your January estimate covering the plumbing and heating work on the above mentioned project. We were compelled to withhold your payment until we received your waiver from the Oklahoma Office of Crane Company.

"The release of Crane Company dated February 15 does not meet with our approval, as the form used is a waiver of lien used on private enterprises, but does not hold good on government work. It is our request, therefore, that you again contact the Crane Company office and have them prepare a release as follows:

"We, the Crane Company of 705 West Main Street, Oklahoma City, Oklahoma, will hold the H. W. Thompson Heating & Engineering Company of Stillwater, Oklahoma, duly responsible for the payment of all plumbing and heating material furnished on the 18 Four Family Apartments now being erected at Fort Sill, Oklahoma. Further, in the event the H. W. Thompson Heating & Engineering Company default in the payment of their account to us, we will not hold James McHugh Sons, Inc., General Contractors, of 6449 South Park Avenue, Chicago, Ill., responsible for the payment of our account. This release embodies all the materials to be furnished by us in connection with this contract.

"The above form of release must be signed by a duly authorized representative of the Crane Company and should be attested to by a Notary Public. Would request you to send us this release at the earliest possible date, obliging
"Very truly yours,
"James McHugh Sons, Inc.
"CJB/b Encl."

So we see that James McHugh Sons, Inc., put itself in this position:

1. By the sixth paragraph of the subcontract it had a right to exact from the subcontractor a corporate surety bond guaranteeing the faithful performance of that contract by the subcontractor, but to its knowledge that surety at the time it exacted that bond had been released from any right thereon in favor of Crane Company.

2. Before or at the time of payments for completed work could be made by the quartermaster to the contractor an affidavit that all payments had been made for all labor and material had to be made. There is no evidence that that affidavit was not made and, if so, it was presumptively true. There is no evidence about that.

3. It was further agreed in the subcontract that the contractor might retain out of any moneys at any time due the subcontractor a sum sufficient to pay all persons who had performed labor or furnished materials as a protection of the contractor against loss, and he had a right to retain said sums so withheld until satisfactory evidence was furnished the contractor that such claims had been fully satisfied. The contractor apparently retained all moneys due the subcontractor based on the first monthly estimate. There was no evidence that the subcontractor was ever thereafter given an opportunity to offer satisfactory evidence that they had been paid.

4. The letter of date February 24, 1934, written by the contractor to the subcontractor containing directions that the letter be presented to Crane Company, was in effect notice that unless the release from Crane Company demanded therein was forthcoming, was equivalent to a threat to both Crane Company and the subcontractor that all other payments thereafter due the subcontractor would be likewise withheld by the contractor, and constituted duress for the release from Crane Company's claim.

5. It is uncertain, at least, whether the contractor's demand for release in its letter of February 24, 1934, was from the

bond signed by the United States Fidelity and Guaranty Company for the subcontractor on December 17, 1933, or from the bond given by the contractor and the four surety companies on January 8, 1934.

McHugh's efforts, above stated, were also in flagrant disregard of the policy of the United States as disclosed by the above cited act of Congress.

There is no evidence in the record as to when the subcontractor became delinquent in payments of labor and for material or the amounts thereof.

When the final hearing came on Mr. Owen said:

"I am appearing for McHugh Sons, Inc., and the surety companies that are mentioned in the plea of intervention of Crane Company, and I am not appearing for Mr. Thompson. Judge Swank appears for him. This is respecting Crane Company's claim of intervention as against McHugh and Sons and the surety companies. Our position is that on the proof which we will now submit and the depositions which we will offer, Crane and Company is estopped from claiming anything against McHugh and Sons or the surety companies that Thompson may owe Crane Company."

Opposing, I think it may be said on the facts that McHugh breached the subcontract for the purpose of relieving itself from a possible loss knowing if it succeeded that the loss would be shifted to Crane Company. That loss was primarily McHugh's, and it and its sureties should be held for it.